F34iahms ag                    SENTENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         13 Cr. 616 VB

5   RIZVE AHMED,

6                 Defendant.

7   ------------------------------x

8                                       March 4, 2015
                                        12:10 p.m.
9                                       White Plains, N.Y.

10  Before:

11                    HON. VINCENT L. BRICCETTI,

12                                       District Judge

13                    APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    EMILY RAE WOODS
16  BENJAMIN ALLEE
         Assistant United States Attorneys
17
    BRAD HENRY
18       Attorney for Defendant

19  KERWIN JOHN, DOJ

20

21                    SENTENCE

22

23

24

25

1          THE COURTROOM DEPUTY:  United States v. Rizve Ahmed.

2          MS WOODS:  Emily Rae Woods for the government.  With

3   me is Benjamin Allee and Special Agent Kerwin John from the

4   Department of Justice.

5          MR. HENRY:  Brad Henry for Mr. Ahmed.  Good afternoon.

6          THE COURT:  Good afternoon, everybody.  Have a seat,

7   please.  This matter is on for sentencing today, the defendant

8   having pleaded guilty to bribery of a public official and

9   conspiracy to commit wire fraud and honest services fraud, two

10  separate counts, Counts 3 and 4 of the indictment respectfully.

11         I've reviewed the following materials in preparation

12  for sentencing.  The presentence report dated January 8, 2015

13  from probation officer, or prepared by probation officer Sarah

14  K. Willette.  Plea agreement dated October 15, 2014.  Defense

15  counsel's sentencing memorandum dated February 19, 2015 as well

16  as the letters and materials attached thereto.  I've also gone

17  back and reread the declaration submitted by the defendant in

18  June of 2014 in support of his motion to suppress which is

19  relevant to the guidelines calculation in this case.  And I've

20  also reviewed the government's sentencing memorandum dated

21  March 2, 2015.

22         Has anything else been submitted that I failed to

23  mention?  Ms Woods?

24         MS WOODS:  No, your Honor.

25         THE COURT:  Mr. Henry?

F34iahms ag                    SENTENCE

1           MR. HENRY:  No.  Thank you, your Honor.

2           THE COURT:  Mr. Henry, have you read the presentence

3     report and discussed it with your client?

4           MR. HENRY:  I have.

5           THE COURT:  Mr. Ahmed, have you read the presentence

6     report?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Have you discussed it with your attorney?

9           THE DEFENDANT:  Yes.

10           THE COURT:  Ms Woods, have you read the presentence

11     report?

12           MS WOODS:  Yes.

13           THE COURT:  The presentence report reflects the

14     sentencing range as follows.  The base offense level according

15     to the PSR is 12.  Guideline section 2C1.1(a)(2).  A two-level

16     upward adjustment for more than one bribe.  A ten-level upward

17     adjustment because the value of the payments to be obtained by

18     the public official exceeded $120,000.  That's 2C1.1(b)(2) and

19     2B1.1(b)(1)(F).  Four-level upward adjustment because the

20     offense involves a public official in a high level or sensitive

21     position.  That's 2C1.1(b)(3).  A three-level upward adjustment

22     because the victim was a member of the immediate family of a

23     government officer or employee and the offense was motivated by

24     such status.  That's 3A1.2(a)(1)(C) and (a)(2).  A two-level

25     upward adjustment for obstruction of justice based on false

F34iahms ag                    SENTENCE

1   affidavit or declaration under penalty of perjury submitted in

2   support of the motion to suppress.  3C1.1.  Three-level

3   downward adjustment for acceptance of responsibility.

4           Therefore, the final offense level according to the

5   PSR is 30.  And at Criminal History Category I, the sentencing

6   range is 97 to 121 months imprisonment, the supervised release

7   range is one to three years, and the fine range is $15,000 to

8   $150,000.

9           Does the government have any objection to the factual

10  statements in the PSR?

11          MS WOODS:  No, your Honor.

12          THE COURT:  Does the defendant have any objection to

13  the factual statements in the PSR?  And I'll carve out that

14  question, the discussion of whether the official victim

15  enhancement applies.  Putting any objections related to that to

16  the side, do you have any other objection to any of the factual

17  statements in the PRS?

18          MR. HENRY:  No, your Honor.

19          THE COURT:  There being no dispute as to the facts,

20  setting aside for the moment the question of the official

21  victim enhancement, the Court adopts the factual statements in

22  the PSR as the Court's own findings of fact for the purposes of

23  sentence.  Do you have any other objections to the PSR or its

24  guidelines calculations?

25          MS WOODS:  No.

F34iahms ag                    SENTENCE

1          THE COURT:  Does the defendant have any other

2     objections to the PSR or its guidelines calculations, putting

3     aside for the moment the official victim issue?

4          MR. HENRY:  No, your Honor.

5          THE COURT:  Okay.  Let's deal with some of these

6     issues.  First of all, of course I dealt with this in the

7     preceding sentencing hearing involving Mr. Thaler, but this is

8     a separate proceeding.  First of all, the parties agree that

9     the offense involved more than one bribe, such that there is a

10    two-level upward adjustment.  Of course, it was only one

11    payment for a thousand dollars.  And it's clear from what I've

12    seen anyway that there were negotiations regarding additional

13    large payments but in the end those payments were never

14    actually made.  So the question is, and I'd like counsel to

15    tell me what their presumably agreed-upon position is, tell me

16    why this adjustment applies, meaning the two-level adjustment

17    for more than one bribe, and the related question is why the

18    ten-level adjustment based on the value of the payments to be

19    obtained applies.  And again, by agreement the parties have

20    said that the value of the payments exceeded $120,000.  They've

21    agreed on this.  And I'd like to hear a little bit more on the

22    record as to why the parties agree these two adjustments apply,

23    when we had one actual payment and where some of these text

24    messages that are quoted verbatim in the government's brief

25    seem to suggest that the parties were still negotiating the

F34iahms ag                    SENTENCE

1  important terms of this deal, the most important of which is

2  how much money was involved.  Ms Woods.

3          MS WOODS:  Yes, your Honor.  The more than one bribe

4  enhancement applies here despite the fact that there was only

5  one single cash payment of one thousand dollars because that

6  payment was in exchange for multiple official acts.  As the

7  defendant has admitted, multiple documents were turned over as

8  a result of that cash bribe payment that related to Individual

9  Number 1.

10         The second objective of that bribe payment was to

11 incentivize Special Agent Lustyik to provide his official

12 assistance in interfering with an investigation involving an

13 ally of Mr. Ahmed's political party.  Because that payment was

14 in exchange for two discrete official acts it would qualify as

15 more than one bribe under the enhancement.

16         In addition, under an alternative theory, the

17 government would maintain that this enhancement would apply

18 despite the fact there was a single payment because the parties

19 agreed together to an arrangement whereby Mr. Ahmed would

20 provide a $40,000 retainer fee and $30,000 monthly in exchange

21 for continued transmission of sensitive internal law

22 enforcement information relating to Individual Number 1.  And

23 the support for that is, as your Honor mentioned, the text

24 messages between the parties, as well as this defendant's own

25 admission at the time he was arrested when he was voluntarily

F34iahms ag                    SENTENCE

1    interviewed by investigating agents.

2           THE COURT:  That answers, I take it that answers both

3    questions, why the two-level upward adjustment applies to more

4    than one bribe, and why the ten-level upward adjustment applies

5    to the value.  Payments to be received exceeding $120,000.

6           MS WOODS:  That's right, your Honor.

7           THE COURT:  Mr. Henry, do you agree with the

8    government's analysis as to why these two enhancements apply in

9    this case?

10          MR. HENRY:  We agree.

11          THE COURT:  That's sufficient for me.  As I've said,

12   we are very fortunate that all the lawyers in this case are

13   highly competent professionals whose judgment I trust.  And if

14   the lawyers believe based on their analysis of the evidence and

15   the facts and circumstances with which they're far more

16   familiar than I am that those adjustments should apply, in

17   other words they both say they should apply, then that's good

18   enough for me.  And I'm not in the business of second-guessing

19   agreements between competent counsel.  That would send the

20   wrong message.  That would counter the institutional incentive

21   to encourage counsel to, to the extent possible, compromise

22   their differences and come up with agreements that will

23   facilitate the disposition of cases.  So I accept those.

24          There's also a three-level upward adjustment which the

25   government contends applies under 3A1.1(a)(1)(C) because

F34iahms ag                     SENTENCE

1   according to the government the victim here was a member of the

2   immediate family of a government officer and the offense of

3   conviction was motivated by such status.  Probation has agreed

4   with that position.  But my understanding is, Mr. Henry, that

5   you disagree with that position.  I saw that you were in the

6   courtroom earlier when I ruled on this issue in connection with

7   Mr. Thaler's case.  I'll tell you right now I don't intend to

8   rule differently in this case.  But it is a different case for

9   purposes of sentencing so you're welcome to say anything you

10  wish at this time.

11          MR. HENRY:  I would rely on our written submission in

12  regard to that.

13          THE COURT:  Is it correct that you were here before

14  when I addressed this issue earlier?

15          MR. HENRY:  Yes.  I was here, heard everything, and we

16  agree with the Court and your analysis as well.

17          THE COURT:  I read the parties' respective submissions

18  and the cases cited therein.  I find that the official victim

19  enhancement does not apply under the circumstances of this

20  case.  It strikes me as illogical to apply the enhancement in a

21  bribery case where the victim, in this particular bribery case

22  anyway, is the public itself, because the bribery of a public

23  official is intended to and in fact does compromise the

24  integrity of that official.  That's what Mr. Ahmed has been

25  convicted of; both counts relate to that.  Perhaps you might

F34iahms ag                    SENTENCE

1    say that the victim is the United States.  It's that the

2    confidential information that was disclosed belonged to the

3    United States, physically was in the United States, in

4    particular the FBI.  So perhaps the victim is the United States

5    for that reason.  But I don't see how any individual was the

6    victim of the offenses of conviction here.  And 3A1.2 clearly

7    applies to victims who are individuals.

8         The government's argument is that Individual 1, the

9    person described as the victim, was the victim because he was

10   the son of the Prime Minister of Bangladesh and Ahmed wanted to

11   obtain confidential information with which to embarrass or

12   humiliate Individual 1 politically, perhaps even to expose as

13   corrupt Individual 1, or his family, and then that Ahmed was

14   doing this because Individual 1 and his mother, the Prime

15   Minister of Bangladesh, belonged to the ruling party of

16   Bangladesh, while Ahmed and his associates belonged to the

17   party currently out of power, formerly in power but currently

18   out of power in Bangladesh.

19        There's a number of references in the indictment to

20   e-mails between among Mr. Lustyik, Mr. Thaler, Mr. Ahmed about

21   corruption allegations involving Individual Number 1 and it

22   seems to me that what was going on here was a desire to

23   embarrass Individual 1 and his mother and ultimately that may

24   have been Mr. Ahmed's goal.  But the gist of the bribery scheme

25   or the bribery offense was, which is Count 3, was the

F34iahms ag                    SENTENCE

1   corruption of an FBI agent.  And the gist of the conspiracy to

2   commit honest services fraud, which was Count 4, was to deprive

3   the citizens of the United States, not the citizens of

4   Bangladesh, of their right to the honest services of Agent

5   Lustyik.

6          So these are the offenses of conviction here and Ahmed

7   was not convicted of potentially other crimes such as making

8   threats against Individual 1 or his family or attempting to

9   assault or kidnap him or harming him in some either way.  If

10  that's what this case was about and there was evidence of that

11  and he was convicted of that, then Individual 1 would be a

12  victim.  But he's not a victim of the offenses of conviction

13  and 3A1.2 does not apply for that reason alone.

14         Before I move onto something else, I will say and I

15  want to make it clear for the record that Ahmed's goal, to

16  embarrass or humiliate Individual 1 by releasing confidential

17  information about Individual 1, is certainly relevant to

18  sentencing.  It's really, to say the least, objectionable,

19  maybe even abhorrent conduct.  And to say the least, it's a

20  serious matter to corrupt an FBI agent in order to achieve that

21  kind of goal or to obtain dirt on a political opponent.  But as

22  I've said, it's the corruption of the agent not the use of the

23  dirt that is the gist of the offenses of conviction in this

24  case.

25         I do believe that the government's attempt to have the

F34iahms ag                    SENTENCE

1   Court find that the three-level adjustment for official victim

2   applies is an attempt to put a square peg in a round hole.  It

3   just doesn't quite fit and I reject it.  There are other

4   reasons why 3A1.2 doesn't apply.  First of all, the information

5   obtained was not owned by or created by Individual 1, it was

6   not taken from or obtained from Individual 1, so in that sense

7   he's not a victim.  Moreover, I'm not at all persuaded that the

8   official victim enhancement was intended to apply to a foreign

9   official or official's family.  The government has cited no

10  controlling or even persuasive authority to support their

11  argument on this point.

12          I read the cases that are with cited in the

13  government's brief.  The Kim case is a district court opinion

14  which is not binding on me in which the district court judge

15  said, without any citation to authority or reference to any

16  underlying legislative history relating to the deliberations of

17  the Sentencing Commission that the Commission would have

18  included United Nations employees had that fact scenario been

19  presented to them.  Honestly I don't get it.  I don't see why

20  he thinks that.  But it's clearly not binding and it's

21  definitely not persuasive.

22          The government also cites the case of Lavario, a case

23  out of the Fifth Circuit, making reference to a finding in

24  *dicta*, of course you can't find in *dicta*, but there is *dicta* in

25  that case suggesting that 3A1.2 might apply to a foreign law

F34iahms ag                    SENTENCE

enforcement agent who has been assaulted by the defendant.  Of

course we don't have any assault here, and Mr. Wazed is not a

foreign law enforcement agent.  In any event,  that case did

not turn on that 3A1.2 issue at all, so that's why that

discussion of the case was *dicta* and is not persuasive or

controlling here.

          There's nothing in 3A1.2 to suggest that it applies to

foreign officials and although I don't have anything to cite

to, it's just my sense based on my experience with the

guidelines and the Sentencing Commission that the Commission

did not have foreign officials in mind when it drafted this

guideline, which has been around for a long time, and there's

nothing in the historical record that suggests that the

Sentencing Commission ever considered applying this to foreign

officials, particularly because, and I think Mr. Henry alludes

to this in his brief, there are plenty of federal statutes that

address criminal conduct directed at federal officials or the

families of federal officials.  And it just seems to me it's a

matter of common sense that that's what the Sentencing

Commission was addressing when they drafted this particular

guideline.

          I will also say for the record that the government's

contention that Ahmed in fact sought to kidnap and physically

harm an individual is a stretch.  I just don't feel there's

enough evidence that's been presented to me for me to make that

F34iahms ag                    SENTENCE

finding.  Ahmed made conflicting statements about what he intended to do with respect to Individual 1 when he was interviewed following his arrest a year and a half or so after the bribery scheme in this case had petered out and that's contained in Exhibit A to the government's brief, particularly on page 7 -- again, this was the memorandum of interview of Ahmed following his arrest in this case.  And he was asked of course about involvement in this case but he was also asked about his involvement with a private investigator by the name of Steve that he hired after the Lustyik/Thaler conspiracy had petered out, and in the context of being asked about his relationship with Steve, according to the memo of interview, Ahmed told Steve that he wanted his help in obtaining private security for BNP officials in Bangladesh, I guess that's the initials for the party that Mr. Ahmed, a United States citizen of Bangladeshi origin, supports.  Of course, he has the right to do that.  As an aside, he can support anybody he wants.  In the future it might be better for him to support parties here in the United States, the country of which he is a citizen.

In any event, he was asked about BNP party officials and Ahmed also allegedly told Steve that he wanted his help regarding a plan to scare and hurt Individual 1.  And it also says in the report that Ahmed initially told the investigators that he was just kidding about such a plan.  But when he was questioned further, and I know what that means because I've

F34iahms ag                    SENTENCE

1    been involved in the criminal justice system for sometime, so

2    when an agent says when questioned further, I know what that

3    really means is that they didn't buy it and they were very

4    aggressive, and that's perfectly fine, there's nothing wrong

5    with being aggressive, it's just softened a bit when it says

6    something like "when questioned further," Ahmed acknowledged

7    that his intent was genuine when he asked Steve for help to

8    hurt and kidnap but not kill Individual Number 1.  Steve said

9    that was possible but they didn't discuss it any further.

10          That's the support for this contention and as I said

11   earlier, Ahmed's overall intentions with respect to Individual

12   1 are to say the least unkind and highly relevant to sentencing

13   in this case.  But I don't believe that there's sufficient

14   evidence that he really did seek to kidnap and physically harm

15   Individual 1.  As I said, the statements he made about it were

16   conflicting.  At first he said he did, then he said he didn't.

17   I don't know which is true.  I'm not going to make a finding

18   that based on these conflicting statements somebody who had

19   nothing to do with this case, meaning Steve, supports the

20   government's contention here.

21          Everything that I've been presented in this case, the

22   text messages and the other things that I've seen -- and I

23   acknowledge that I'm definitely not as familiar with the case

24   as the lawyers are, but all I can do is rely on what I've been

25   provided with -- based on what I've been provided with, this

F34iahms ag                    SENTENCE

1    case is all about furthering Ahmed's political aims, getting

2    confidential information to expose what Ahmed apparently

3    thought was corrupt behavior by the ruling party and otherwise

4    embarrass Individual Number 1.  And that's all terrible

5    behavior and as I said relevant to sentencing.  But there's no

6    talk in these exchanges about doing physical harm to Individual

7    1.  So I cannot find that that objective was part of the

8    offense of conviction here.

9         Also, as I said, Ahmed's post-arrest statements

10   related to the discussions he had with the private investigator

11   he hired to get dirt on Individual 1 long after breaking off

12   his relationship with Lustyik and Thaler.  So even if those

13   comments did reflect a intent to cause physical harm in

14   connection with his dealings with Stever, and as I said, I'm

15   not sure that they do reflect that intent, but even if they do,

16   it does not appear that an intent to physically harm Individual

17   Number 1 based on those statements was ever a part of the

18   bribery conspiracy or the bribery or the conspiracy to commit

19   honest services fraud of which Mr. Ahmed has been convicted.

20        Finally, it's also clear, fortunately, that Individual

21   1 was in fact never physically harmed nor was there ever an

22   attempt to harm him.  According to Individual 1 as reflected in

23   the presentence report, the release of confidential information

24   could have led to harm to him and his family and I think that's

25   probably true, it could have.  But there's nothing in his

F34iahms ag                    SENTENCE

1   victim impact statement that suggests he was ever harmed, even

2   reputationally or politically.

3           For all these reasons I find that the official victim

4   enhancement does not apply in this case.

5           Are there any other guidelines issues as such that

6   need to be resolved or is it just that one at this point?

7   Ms Woods?

8           MS WOODS:  There are no other.

9           MR. HENRY:  That's the only one, your Honor.

10          THE COURT:  Thank you.  Based on the parties'

11  agreement as set forth in their plea agreement as well as my

12  review of the presentence report and my own evaluation of the

13  guidelines, I find and conclude that the final offense level is

14  27, Criminal History Category I, which yields a sentencing

15  range of 70 to 87 months imprisonment.  There's been no motion

16  for any guidelines-based departure from the applicable range.

17          Does the government wish to be heard on sentencing?

18          MS WOODS:  Yes, your Honor.  Speaking first to the

19  nature and circumstances of this offense, the public official

20  involved in this bribery scheme in which Mr. Ahmed

21  participated, was a high level special agent with the FBI.  He

22  was working in the counter intelligence unit and he was a 24

23  year veteran of the force.  As a counter intelligence special

24  agent he had top secret FBI security clearance and access to

25  vast quantities of highly sensitive, classified internal law

F34iahms ag                    SENTENCE

1   enforcement information.  Mr. Ahmed sought out this individual

2   and promised him cash bribes in order to get information on

3   Mr. Ahmed's political opponent, to embarrass him, and to

4   publicize that he had been investigated by the United States.

5   Mr. Ahmed's actions were not a momentary lapse in judgment.

6   Instead, the conduct in which he participated took place over a

7   period of months, it involved multiple in-person meetings,

8   multiple communications via texts and via e-mail.  Mr. Ahmed

9   even went to the extent of developing false FBI credentials and

10  business cards and fictitious FBI reports that were marked

11  classified in furtherance of the scheme.  He did succeed in

12  getting his hands and highly confidential information that

13  contained personal identifying information about Mr. Wazed, who

14  spoke earlier in court today, and who is a political figure in

15  Bangladesh and does fear for his safety on a regular basis.

16          THE COURT:  Ms Woods, I'm sorry to just interrupt.  He

17  did speak earlier.  But he's not going to speak here.  So I

18  don't want the record to reflect that I'm relying in any way,

19  shape, or form on what Mr. Wazed said in a separate proceeding

20  in this case.

21          MS WOODS:  The government would actually ask that you

22  do rely on what you said at the earlier sentencing.  We talked

23  to Mr. Henry about it, he was present at the earlier sentencing

24  proceeding, and he does not object.

25          THE COURT:  If that's the case, then that's a

F34iahms ag                    SENTENCE

1    different kettle of fish.

2            MR. HENRY:  I will say he has not testified in this

3    proceeding, so it is not -- what he said there is not a part of

4    the official record.  I understand the Court has heard what

5    Mr. Wazed has said.  You can't for lack of a better phrase put

6    the toothpaste back in the tube.  I understand that it may come

7    into play.  So for those reasons, what Mr. Wazed said in that

8    proceeding are fine.  But I do agree with the Court, they are

9    not part of this official proceeding.

10           THE COURT:  They're not a part of the proceeding but

11   what he said was consistent with what he said to the probation

12   officer in the presentence report.  So we certainly know about

13   that.  He just fleshed it out and gave some sort of context of

14   who he is and who his family is and his history and his

15   relationship to his mother.  But none of that is inconsistent

16   with what he said previously.  So you don't have any, you're

17   not asking me to unring a bell.  I heard what I heard.  I don't

18   really think it adds to what was already in the PSR.  You're

19   not asking me to, like we say to a jury sometimes, "you shall

20   disregard that."  You're not asking me to do that?

21           MR. HENRY:  No, your Honor.

22           MS WOODS:  The bottom line is that the information

23   that Mr. Ahmed was able to obtain as a result of the bribery

24   scheme involved Mr. Wazed's personal and Social Security

25   number, his address where you he and his family lived, his bank

F34iahms ag                    SENTENCE

account balances, activity and account numbers, and other

sensitive information, including Mr. Wazed's interactions with

authorities here in the United States, such as the Customs and

Border Patrol Agency and the FBI.

          Moreover, Mr. Ahmed sold the information he received

upstream.  He paid a thousand dollars for the three documents

that we've discussed in the previous proceedings and sold it in

exchange for $30,000 and took efforts to gain additional

information.  The scheme itself ended as we've noted without

the exchange of additional cash bribes for information.

However, it did not end because Mr. Ahmed had a change of heart

or decided to stop participating in the criminal activity.

Instead, it ended because around that same time, Mr. Ahmed

found a different source, the private investigator with whom he

was working, and he paid that private investigator four

thousand dollars in exchange for information on Mr. Wazed.  And

when he went back to Special Agent Lustyik and e-mailed him a

photograph with a fistful of cash at that point, he was

rejected by Special Agent Lustyik through Thaler for having

waited too long.  So your Honor should not consider the fact

that the scheme didn't come to full fruition as a mitigating

factor for Mr. Ahmed considering that by every account he tried

to continue the scheme.

          THE COURT:  Basically what you're saying is that in

the end there was only a thousand dollars paid but it was not

F34iahms ag                     SENTENCE

1      for lack of trying by Mr. Ahmed.  He was trying even after he

2      started dealing with somebody else to reengage Mr. Lustyik and

3      it just never actually happened.  But he tried.

4                  MS WOODS:  That's right.

5                  THE COURT:  But it's also true, is it not, Ms Woods,

6      that Mr. Ahmed, as reflected in the text messages that I've

7      seen anyway, was a bit cagey.  In other words he was saying we

8      got plenty of money here and we can pay you lots and lots of

9      money and you'll be rich and I'll be a hero but you got to show

10     me some really good stuff first and then we'll pay the money.

11     To which Thaler said, well, and maybe Lustyik as well, but

12     certainly Thaler said no, no, first you got to show me the

13     money, then we'll show you the information.  That went back and

14     forth for a while and neither side budged and nothing further

15     happened.  There was no further payment of money or exchange of

16     information.

17                 MS WOODS:  That's right.  Mr. Ahmed expressed both a

18     concern that the information wouldn't be worth the money that

19     he was providing as well as a concern that these individuals

20     would take his money and run, and he would not have any

21     repercussions.

22                    With respect to the harm caused by his crimes, it's

23     clear that this bribery scheme seriously undermined the FBI and

24     law enforcement agencies generally and the criminal justice

25     system.  The citizens here in America depend on our law

F34iahms ag                    SENTENCE

enforcement agents to be, to both enforce and to obey the law,
and to be above reproach.  And Special Agent Lustyik failed in
that regard and Mr. Ahmed facilitated that through the scheme.
They convinced the Special Agent Lustyik to violate his oath,
to break the law instead of enforce the law, and in doing so
they undermined the integrity of the FBI and the criminal
justice system.  Witnesses are going to be less likely to come
forward and make reports if they know that those reports could
be leaked to the subject of the investigation as happened here.

THE COURT:  Is it possible, Ms Woods, is it possible
that, or do you think it's possible, might be a better way to
put it, that Mr. Ahmed had a worldview on corrupt public
officials based in part on his experience with the Bangladesh
system, where arguably corruption is more endemic, more sort of
understood to exist, and didn't quite fully appreciate the
shocking nature of what he was doing because he was applying
some sort of value that, some sort of view, worldview is best I
can come up with, view about corruption about corruption among
public officials that he had learned in the Bangladesh and he
was somehow applying that to the United States?

MS WOODS:  It's my understanding that Mr. Ahmed moved
to America when he was approximately 13 years old.

THE COURT:  That's true, and he's a U.S. citizen.  But
he was trying to, for some reason, further the goals of some
political party ten thousand miles away or eight thousand miles

F34iahms ag                    SENTENCE

1    away.  He must have thought that was important.

2              MS WOODS:  He was undoubtedly interested in Bangladesh

3    politics.  But his standards and his awareness of what is and

4    what is not criminal in this country cannot be questioned.  He

5    was educated here in college and throughout the conspiracy

6    there were indications from Mr. Thaler and from Special Agent

7    Lustyik that what they were doing was criminal, was illegal.

8    For example, they explained to him that they would remove the

9    individual's names who pulled the documents so it couldn't be

10   traced back to them.  So Mr. Ahmed from that must have

11   understood that what he was getting he shouldn't have been

12   getting.

13             THE COURT:  I'm not suggesting for one second that

14   Mr. Ahmed did not know he was committing crimes.  That's not

15   what I'm saying.  It's just so blatant and it's so gross.  It's

16   almost as if he didn't fully appreciate -- of course it's

17   criminal, it's criminal in Bangladesh too, to bribe public

18   officials, probably.  But you know everybody does it.  The way

19   they do business over there, maybe that's the way we do

20   business over here.  I'm just wondering if you think that's

21   what he thought.  Statements he made to the agent or something

22   you learned during your investigation.  It doesn't provide an

23   excuse or anything remotely connected to a defense, but it

24   might explain why he would engage in such ridiculous and absurd

25   behavior.

F34iahms ag                    SENTENCE

1          I'm putting you on the spot I agree.  I don't

2   personally know that many people who would think this is a

3   worthwhile endeavor.  Let's just find an FBI agent and bribe

4   him and get some stuff.  Most people around here at least that

5   I know it wouldn't even occur to them to do that.  Because

6   they're not used to that sort of thing.  They're not used to

7   hearing about, thank God, FBI agents who are willing to sell

8   their soul.  They're just not used to hearing that sort of

9   thing.  It would be a very unusual experience, which is why

10  this such a serious matter.  To the extent it creates a public

11  perception that you can't trust an FBI agent if somebody

12  dangles a pile of money in front of them.  That's a terrible

13  outcome if people actually begin to believe that, which is one

14  of the reasons why this is such a serious matter.  I'm just

15  wondering whether there's some kind of cultural difference here

16  that would provide, some kind of context that would explain why

17  Mr. Ahmed would do what he did.

18          MS WOODS:  I have not seen anything that would suggest

19  that his behavior was born of some cultural difference.  Based

20  on his statements and the sentencing brief it appears as though

21  his motive was ego driven, that he was suddenly presented with

22  the opportunity to obtain information from a high level FBI

23  agent who was willing to sell his office for personal gain, and

24  Mr. Ahmed, interested in politics in Bangladesh, and interested

25  in being a player in that world, took advantage of the

F34iahms ag                    SENTENCE

1    opportunity hoping that it would make him a leader in the party

2    and would ingratiate him with his political allies and he took

3    advantage of the situation for that reason.  That doesn't mean

4    that he didn't understand while he was doing it that what he

5    was doing was dramatically out of bounds and was criminal.  And

6    that's evidenced across-the-board.  It's evidenced when agents

7    originally went to investigate this matter and approached him

8    for an interview and he lied to them about his conduct,

9    evidencing that he understood what he had done was wrong and he

10   knew it long before this investigation.

11          I'd also like to point out for the Court that

12   Mr. Wazed, whether or not the Court considers him a victim in

13   this case under the law, he was certainly harmed in some sense

14   by the leak of the information.  His Social Security number,

15   his personal data is out there.  And Mr. Ahmed sold it

16   upstream.  And as Mr. Wazed explained to the court earlier

17   today, his address was leaked and publicized and as a result he

18   had to move his wife and child to a new home in D.C.  His fear

19   for his safety is genuine and based on historical violence and

20   current day threats here in the United States.  This is not a

21   joking matter for him.

22          THE COURT:  I certainly agree with everything you've

23   just said.  What he did say was fleshing out, but that's

24   essentially what he said to the probation officer as well.

25          MS WOODS:  That's right.

F34iahms ag                    SENTENCE

1          THE COURT:  I'm not for one second suggesting that

2     this is, it doesn't really matter what happened to Mr. Wazed, I

3     don't really care, that's not what I'm saying.  I'm saying that

4     he's not an official victim as that term is defined in that

5     portion of the guidelines.  That's all I'm saying.  I'm not

6     saying that this is not bad behavior on behalf of Mr. Ahmed.

7     I'm not saying it's not relevant.  It is relevant to

8     sentencing.  It absolutely is relevant to sentencing.  I want

9     the record to be clear on that, I'm not pooh-poohing the

10    significance of the impact on Mr. Wazed.  What I am saying is

11    that he doesn't fit, the square peg in the round hole

12    proposition.

13         MS WOODS:  With regard to the harm, another harm is

14    that Mr. Wazed, as discussed, was investigated by a United

15    States agency and those reports were leaked to Mr. Ahmed and

16    leaked upstream.  Prior to that Mr. Wazed and the Bangladesh

17    government did not know that the United States Government had

18    investigated them, and they do now as a result of this bribery

19    scheme, and that's another factor that this Court should

20    consider, the leak of that sensitive information to a foreign

21    government and to the public.

22         And while your Honor cannot and I cannot assess the

23    impact that it may or may not have on Mr. Wazed's reputation,

24    it certainly caused a harm to the United States' ability to

25    keep its investigations of foreign officials, highly sensitive

F34iahms ag                    SENTENCE

 1   information, from the public.  And along those lines, it's

 2   important that the Court also consider that Special Agent

 3   Lustyik was in counter intelligence and his involvement in this

 4   bribery scheme with Mr. Ahmed made him vulnerable to potential

 5   blackmail down the road if things went awry.  The fact that he

 6   participated in these crimes, that he was willing to sell his

 7   office and violate the law with these individuals, put this

 8   nation at risk.  Those individuals could very easily turn it

 9   back around and certainly be making demands of him and

10   blackmailing him with evidence of the crimes that he's already

11   participated in.

12              THE COURT:  That's a good point.  Not a point that you

13   made in your brief, but I understand the point.  It also seems

14   particularly relevant to Mr. Lustyik, a little bit so to

15   Mr. Thaler or Mr. Ahmed but not irrelevant.  It's relevant.

16   Just so we're clear, is there any evidence that the fact of

17   this criminal investigation was leaked to the public and to a

18   foreign government caused any harm to any investigation, I'm

19   not talking about Wazed now, generally to the process if you

20   will, or that Mr. Lustyik ever was subject to any kind of

21   blackmail?

22              MS WOODS:  With respect to the first question, I

23   cannot present any evidence today that it impeded or obstructed

24   an ongoing investigation.  I'm aware that the State Department

25   was involved when the reports were found and were leaked and

F34iahms ag                    SENTENCE

1   found in the possession of a journalist in Bangladesh and the

2   Prime Minister discovered them and realized for the first time

3   that the U.S. authorities had been investigating their son.  I

4   know there were investigations that took place and meetings

5   that took place as a result of that.  But to my knowledge -- my

6   knowledge of those meetings is quite limited.  With respect to

7   the national security risk I think that's the way we described

8   them in the brief.  They were risks.  There's no evidence that

9   he was blackmailed or forced to turn over classified

10  information or take other steps as a result.  But he was

11  certainly open to the risk of that because of his participation

12  in these criminal activities and vulnerable to that.  And

13  that's another factor that in the government's view your Honor

14  should consider in determining the appropriate sentence.

15          If the Court doesn't have any questions ...

16          THE COURT:  I don't.  You were very kind to answer all

17  the questions I asked you even though it broke up your

18  presentation.  Thank you for for doing that.  Mr. Wazed is not

19  here.  Unlike the prior proceeding, he's not here to provide a

20  victim impact statement, is that correct?

21          MS WOODS:  That's correct.  He's on his way back to

22  Washington, D.C., but he did ask that your Honor consider it at

23  this hearing.

24          THE COURT:  Mr. Henry, do you wish to be heard?

25          MR. HENRY:  I do, your Honor, briefly.  I'm not going

F34iahms ag                    SENTENCE

 1   to go back over the sentencing memo.  It's typically not very

 2   helpful.  Here's what I will say and what I want to talk to the

 3   Court about and I know you'll probably have a number of

 4   questions.  I want to start with a number of things that you

 5   and Ms Woods talked about.

 6          One being the scheme and how it stopped.  This is a

 7   situation, taken in the totality, I agree with the Court, I

 8   agree with the government, more importantly Mr. Ahmed

 9   understands and has expressed his understanding to me, that

10   this is a terrible case.  Not only in the sense that the things

11   happened that happened and we run into all of these issues and

12   there's the loss of trust, there's all of the things that come

13   along with an offense like this.  Secondly, this is simply a

14   tragedy that these three individuals came up with this

15   hare-brained idea to do these things and now all of them face

16   tremendous penalties under federal law.  Their families have

17   been tremendously affected.  Mr. Ahmed's family, who is here

18   with us, they pay the price for these things.  Mr. Thaler's

19   family, who was here earlier, they pay the price for these

20   things.  And so I don't want it to be lost on the Court that

21   Mr. Ahmed understands very clearly that what happened in this

22   case is not appropriate, was way out of bounds, and can never

23   happen again and shouldn't happen in other contexts.

24          What I will say though in regard to this, your

25   question about a worldview and why is it that people make the

F34iahms ag                    SENTENCE

decisions that they make.  You asked Mr. Thaler that or

speculated about why people do some of the things that they do.

I don't pretend to know the answer to that and I don't know

that Mr. Ahmed even if I asked him, and frankly I have, could

explain in a very good way why he got himself in the situation

he got himself in.

         It's my view and my view alone that it is a

combination of what Ms Woods said and what the Court suggested

in that Mr. Ahmed was in a situation where he felt like he

could be a big shot.  I gather that not just from the

circumstances of the case but when you look at what the

government has mentioned, these FBI documents that he had on

his computer with the wrong address and misspelled bureau and

so forth.  Mr. Ahmed in my estimation, and I don't want anybody

to take offense to this, but in my interactions with him, has a

worldview that is somewhat juvenile, I would think.  And I'm

saying that frankly to the Court and Mr. Ahmed.  He got in a

situation where he felt like he could play super spy and he got

swept away and made these decisions that he made knowing that

he probably shouldn't be doing that.  But I don't think his

objective during this whole period of time was to specifically

target an FBI agent to get specific classified documents so

that at the end of all this he could disclose those to other

people and it be a really big thing.  I think his goal was to

gain information about certain individuals and to provide them

F34iahms ag                    SENTENCE

1    to certain people in his political party, those people being

2    family members and friends who may or may not have pull in that

3    particular party to begin with.  I don't know.  And what shows

4    us that is that Mr. Ahmed didn't find Mr. Lustyik.  The Court

5    talked about this earlier.  Mr. Thaler was sort of the

6    middleman.  It was the suggestion from Thaler that Ahmed and

7    Lustyik sort of to do this and he brokered that deal.  But for

8    Mr. Thaler this probably never would have happened.

9              THE COURT:  I would say it definitely never would have

10   happened.  But it doesn't excuse Mr. Ahmed.

11             MR. HENRY:  It doesn't excuse the conduct.  That's

12   absolutely right.  But when Ms Woods said this scheme stopped

13   because he found somebody else, maybe that's true.  It stopped.

14   But that somebody else was a private investigator.  Mr. Ahmed

15   was not looking for classified documents necessarily.  He was

16   not looking for information that belonged to the government

17   necessarily.  He went to a private investigator and said if you

18   can't get me information on Wazed, whatever it is, I'll get it

19   from somebody else.  And he went to a private investigator who

20   clearly can't get classified documents, at least I hope not,

21   and cannot violate the trust of the FBI and the government and

22   these other places.

23             That was not Mr. Ahmed's intent.  It was certainly to

24   get information and to embarrass and do certain things

25   politically.  We don't contest that at all.  But when you look

F34iahms ag                    SENTENCE

1    at the circumstances of this offense -- the Court said earlier

2    you have to punish a person and the first thing that the Court

3    puts in there is the nature and circumstances of the offense.

4    Well, the nature and circumstance of this offense, if you take

5    it in a vacuum, a person bribes an FBI agent to get classified

6    documents, that is a terrible, terrible thing, it should never

7    happen.  But when you look at it in the totality of the

8    circumstance and you take not only the nature and circumstances

9    of the offense but all of the other 3553(a) factors including

10   his history and characteristics, the evidence that the

11   government presented, we presented, the need to promote respect

12   for the law and all of those things in conjunction, this

13   offense while extremely serious, we have to determine, the

14   Court has to determine what is the appropriate offense for

15   that.  On what scale of:  This is the most awful thing that

16   could have happened and it was for a terrible, terrible

17   purpose, or is this something awful that happened that

18   Mr. Ahmed got caught up in.

19          I can tell you this maybe is the most unsophisticated

20   bribery scheme ever for something that on the back end is very

21   complicated.  Counter intelligence information, SAR information

22   that these financial institutions all over the world are

23   required to keep up with.  I don't know that Mr. Ahmed even

24   when he got it knew what it was.  So the unsophisticated nature

25   of Mr. Ahmed, number one.

1          Number two, the unsophisticated nature of Mr. Thaler.

2     And then you have Lustyik who is clearly the most involved

3     sophisticated individual out of the three.

4          Mr. Ahmed, and I put it in my brief, he is a good

5     person.  I believe that.  I think he made bad decisions but he

6     is a good person.  I think he has a family that loves him.  I

7     think that not for lack of trying he finds himself in a

8     position being 37 years old sitting in front of this Court not

9     having achieved much in his life.  He went to college.  That's

10    an achivement.  He played tennis when he was young, and did

11    really well with that, and that's an achievement, but that's

12    gone.  He may get promoted to a more managerial position, but

13    the money he makes at that job is probably not that much.  He

14    lives at home.  All of those factors, while not talking about

15    Mr. Ahmed in a negative way, his life circumstances don't exude

16    a very complex, complicated player in a game trying to do those

17    things that perhaps these charges and the case suggests.

18         When you look at those things and the factors that we

19    presented in our sentencing memo, Mr. Ahmed served time in jail

20    already.  More than the other two individuals, well, maybe not

21    Mr. Lustyik, but certainly Mr. Thaler, he served approximately

22    five months in Valhalla.  That was probably the most terrible

23    time Mr. Ahmed spent in his entire life.  He's been on

24    supervised release, very strict initially, still fairly strict

25    although he gets to go and work.  He has dug himself up out of

the hole that he got himself in and placed himself in a
position where he can hopefully succeed.  When you look at
sentencing about how do we punish somebody, and there has to be
punishment for this case, just like in every federal criminal
case, there is a level of punishment.  But also you have to
look at how do you rehabilitate the whole person and put him
back out in a society where he will eventually end up as a
productive citizen.

          So one of the questions the Court is probably asking,
because I was purposely fairly vague about it in my sentencing
memo, is what sentence are we really asking for.  But the
reason I was vague about it is because I don't know.  I don't
know in this case what the appropriate sentence is.  I racked
my brain.  I was up, I sat and stared at that sentencing memo
for hours on end.  Do I think probation is appropriate in this
case?  I don't know.  If I'm talking to you, one person to
another, Mr. Ahmed, maybe it's not.  Is a 70 to 87 month
sentence in this case appropriate?  No, I don't think it is.

          But I think there is a combination of things in this
case where Mr. Ahmed could be sentenced, punished but allowed
to maintain his job, go on about his life and probably never
ever commit another crime again.  In fact, it's statistically
almost certain that he won't commit another crime.  And so for
those reasons I would simply leave it to the Court, obviously
it's the Court's decision to make in any event, to determine

F34iahms ag                    SENTENCE

1    what the appropriate sentence is in this case.

2              But it is important to understand that Mr. Ahmed knows

3    what he did.  He has learned a lesson from this.  He will carry

4    that lesson with him for the rest of his life.  When you look

5    at also disparity in sentencing and the need to deter others

6    from committing similar offenses, deterrence is really the main

7    reason, I guess, that they don't want disparity in sentencing.

8    They want everybody to think it's fair and they want everybody

9    to know what's coming down the road if you do the same as some

10   other person.  The guidelines calculate those sentences in a

11   one-way ratchet up.  There are very few ways in a sentence that

12   you can go down.  That's why you you have to consider all of

13   the other things under 3553(a).  I think all of those other

14   considerations, this is a serious offense, that calls for a

15   serious sentence.  There needs to be promoting respect for the

16   law.  But respect for the law includes:  I respect the law, I

17   don't want to break it because I'll get punished, but I also

18   want to respect the law because it's fair, because this person

19   got what was coming to them but it wasn't overly punitive.

20             The seriousness of the offense.  Deterrence in this

21   particular instance, and I've been in a lot of federal

22   courtrooms across the country and have engaged in discussions

23   about those things, and included a lot of studies, I put them

24   in there not to say that deterrence is useless.  But if I was

25   to pick up the newspaper tomorrow and I looked at Bob McConnell

F34iahms ag                    SENTENCE

1    who got sentenced or General Petraeus who got sentenced or any

2    other person who committed a serious bribery or government

3    secret offense and I think they got this many years in prison,

4    the first thing that comes to my mind is not that's a lot of

5    time or not much time.  The first thing that comes to my mind

6    is that they got caught and they got punished.  It is the

7    punishment factor not the amount of time that is the point of

8    all that.

9          Mr. Ahmed has already been punished to a certain

10   extent.  And he's going to get some additional punishment.  He

11   knows that.  You look at that and then you look at disparity at

12   sentencing.  Is it fair, and I know Mr. Ser talked about this

13   earlier, and those are different circumstances in a lot of

14   different ways, with General Petraeus, but Mr. Ahmed, who did

15   these things in exchange for money and potentially the feeling

16   of authority or power or to gain something in that respect is

17   one thing.  Petraeus doing it in terms of favors from his

18   ladyfriend, greed, lust, all of those things are things by

19   which people are motivated and are considered payment.  You

20   don't just have to get payment to get paid.  You can get paid

21   other ways for information.

22         So if you look at that, he's a high-ranking public

23   official, he was the head of the CIA.  You got Mr. Ahmed who

24   worked at Macy's as a shoe salesman.  He gets a misdemeanor

25   offense and does some probation for giving secrets that are so

F34iahms ag                    SENTENCE

 1   much more classified than the information that Mr. Ahmed got,

 2   does that promote respect for the law?  Is that disparity in

 3   sentencing.  I don't know.  Luckily, I'm not in the Court's

 4   shoes who has to make that decision.  But in this instance, is

 5   a significant term in jail the correct answer?  I don't think

 6   so.  I gave you the reasons why in addition to the reasons that

 7   I'm giving you now.

 8          So we'd ask the Court to fashion a sentence that is

 9   punitive in nature, any sentence that you give I think will be,

10   Probation, even Probation is punitive.  But also allows

11   Mr. Ahmed the opportunity to continue on the path that he's

12   gotten himself on now which is working, working well, getting a

13   lot of commendations from his employer, potentially and

14   hopefully making the jump up to the next higher level and

15   living his life in a way that he always has and that we know

16   that he can continue to live his his life.

17          One other point is that unlike Mr. Lustyik and

18   Mr. Thaler, this is Mr. Ahmed's first offense ever.  So he sits

19   in a very different position than those two individuals.  This

20   is not an ongoing thing.  This is not an I am a fraudster, I'm

21   a briber, I'm going to do this again and again and again.

22   Mr. Ahmed got caught up in something way over his head.  He got

23   swept away.  He's sitting here paying the price for that.  I

24   think the point has been made, the lesson has been learned.  So

25   I would, unless you have any other questions, submit the

F34iahms ag                    SENTENCE

1   sentencing memorandum as my oral argument and requesting an

2   alternative to straight incarceration in this particular case.

3          THE COURT:  All right.  Thank you, Mr. Henry.

4          Mr. Ahmed, do you have anything that you would like to

5   say or any information that you would like to present before I

6   impose sentence?

7          THE DEFENDANT:  I'd like to make a statement.  Your

8   Honor, I'd like to just say how sorry I am for what I did was

9   wrong.

10          THE COURT:  You got to speak up so I can hear you.

11          THE DEFENDANT:  I'd like to say I would just say how

12   sorry I am what I did was wrong.  I always try to do good by

13   others and before this I never got myself in trouble.  Having

14   been in jail going through the criminal court process and being

15   under the supervised release was the most horrific moment I

16   experienced in my life.  Being in jail I also reflect my

17   mistake what I did, and I learned my lesson.  And I come from

18   very close to my family and all my family are very close to me,

19   and they all suffered with me.  And what I did it caused a

20   great deal of pain to my family.  And I do hope my, I hope my

21   family and my country and this Court they can forgive me what I

22   did and I learned my lesson from all that.

23          THE COURT:  Okay.  Thank you very much, sir.  You may

24   have a seat.  Again, thank you to the lawyers for doing an

25   excellent job in this case from beginning to end.

F34iahms ag                    SENTENCE

1              Let me say first that in deciding the appropriate

2     sentence in this case, I've considered all of the statutory

3     factors as set forth in Section 3553(a) of Title 18.  There's

4     no question that this was a serious offense.  Mr. Ahmed offered

5     to pay large sums of money to a senior FBI agent in exchange

6     for confidential information about a political rival.  He

7     obtained several internal documents from Lustyik.  He paid

8     Thaler and Lustyik a thousand dollars for that information.  By

9     paying and offering to pay cash bribes to Lustyik, Ahmed

10    undermined the public trust in an important public institution,

11    the FBI.  Obviously, he could not have done this without the

12    willing participation of Mr. Lustyik, and certainly

13    Mr. Lustyik's culpability is much greater than Mr. Ahmed.

14             But Mr. Ahmed's conduct was designed to and did in

15    fact compromise the integrity of a public official.  Bribery

16    and corruption of this sort is what breeds cynicism and

17    distrust among the public and undermines the faith citizens

18    should have in their public institutions and officials,

19    especially law enforcement officials like Mr. Lustyik.

20             It does not appear that what Mr. Ahmed did compromised

21    national security, fortunately.  But given that Mr. Lustyik was

22    a counter intelligence agent, it certainly had the potential to

23    do so.  Moreover, Ahmed's purpose in bribing Lustyik was to

24    obtain information with which he could embarrass prominent

25    members of the ruling party in Bangladesh which evidently is

F34iahms ag                    SENTENCE

the rival of the political party that he apparently supported.
And although it does not appear that Individual Number 1 was
actually harmed, Ahmed's conduct was really reprehensible and
at least potentially harmful to Individual 1 and his family.
On top of everything else, he filed a deliberately false sworn
statement during the course of this case which was designed to
undermine the integrity of this judicial proceeding.

So in my view, Mr. Ahmed is a person lacking in
integrity who feels entitled to do anything he wants to get
what he wants regardless of what the law requires and
regardless of the consequences.  In some ways that's more
serious than someone like Mr. Thaler, for example, who was just
in it for the money, he wasn't in it for the glory or to
inflict embarrassment or humiliation on someone else, even
though he certainly knew that that's what was going on.  But to
me it feels like it's worse that if you do something like this
and it's not for the money.  If you're doing it for the purpose
of inflicting embarrassment and humiliation or scoring
political points, in a way that's worse than just doing it for
the money which is what Mr. Thaler did.

So the conduct involved here is extremely serious and
it warrants a serious prison sentence and that means a sentence
in excess, frankly, of what I've already imposed on Mr. Thaler.
Having said that, the guidelines range of 70 to 87 months is
somewhat skewed because of the ten-level increase based on the

F34iahms ag                    SENTENCE

1    value of the payments.  The parties agree that the value

2    exceeded $120,000.  But I believe that that figure somewhat

3    overstates the true magnitude of the scheme because after all,

4    it was in the end a thousand dollars that was exchanged for a

5    couple of documents.  Lustyik, Thaler -- don't mistake what I'm

6    saying for the suggestion that this was not an extraordinarily

7    serious offense.  It's not only extraordinarily serious, it's

8    just shocking that this kind of thing could actually happen.

9          In my experience when I think about people who want to

10   bribe FBI agents usually it has something to do with some

11   foreign government like the former Soviet Union trying to turn

12   an agent and make him a double agent or something like that.

13   This was just Rizve Ahmed, for goodness sake, who is hardly a

14   sophisticated person, but what he did was of the magnitude that

15   you can't overstate the significance of it.  It's just that I

16   think that the $120,000 figure which does drive up the

17   guideline range substantially somewhat overstates the magnitude

18   of the offense.

19         These folks, Lustyik, Thaler and Ahmed talked about

20   paying tens of thousands of dollars to Lustyik in return for

21   confidential information, but the actual amount paid was a

22   thousand dollars.  If the guidelines level was based on that

23   amount the sentencing range would be 24 to 30 months rather

24   than 70 to 87 months.  I will respect the agreement on the

25   value of the payments but nonetheless given the large -- and it

F34iahms ag                    SENTENCE

1    does drive the guideline range and as I said the guideline

2    range is 70 to 87 months -- but given the rather dramatic

3    discrepancy between what was actually pay which was a pittance

4    and the much larger amount that was contemplated to be paid

5    upon which the sentencing range is based I believe that an

6    appropriate sentence should be closer to the level 17 range

7    than the level 27 range.  In other words, I think the fact that

8    the ten-level enhancement somewhat overstates the seriousness

9    of the offense is a mitigating factor and warrants a

10   nonguideline sentence or a sentence below the guidelines.

11           However, this was a nonviolent offense committed by a

12   first time offender with a rather exaggerated view of his own

13   self-importance, the word grandiosity comes readily to mind,

14   and there's no evidence anyone was actually harmed physically

15   or otherwise by the improperly disclosed confidential

16   information.  Also, and this of course is important, Mr. Ahmed

17   is not a public official himself.  He's not the one who

18   accessed the confidential files.  And he's not the one who took

19   an oath that he failed to honor, like Mr. Lustyik.  So in that

20   sense he's less culpable than Mr. Lustyik.

21           He is not a minor participant in this offense.  He's

22   the instigator if you will.  He, as I said, did what he did for

23   personal aggrandizement I suppose or for other purposes.   In

24   some ways I think that's worse than just doing it for the

25   money.  He filed a false affidavit, it wasn't technically an

F34iahms ag                    SENTENCE

affidavit, but a declaration under the penalty of perjury in
this case.  Those things combined with the fact that the
underlying conduct that was so serious do warrant a very severe
prison sentence in this case.

          My conclusion is that under the circumstances, a
sentence of 42 months, which is, as we know, twelve months
longer than the sentence I imposed on Mr. Thaler, 42 months
imprisonment followed by two years of supervised release is
sufficient but not greater than necessary, taking into
consideration the nature and circumstances of the offense, the
history and characteristics of the defendant, and the need for
the sentence imposed to reflect the seriousness of the offense,
promote respect for the law, provide just punishment, afford
adequate deterrence, and importantly here, avoid unwarranted
sentencing disparities among similarly situated defendants.
The three defendants in this case are not identically situated
but they're similarly situated.  They committed the same
crimes.  And there should be additional punishment for
Mr. Ahmed for the reasons I've stated relative to Mr. Thaler.
But I don't want that to be so, I don't want there to be so
much of a discrepancy between the sentences that I imposed on
those two defendants that it would constitute an unwarranted
disparity.  So I believe that a 42 months sentence avoids
unwarranted sentencing disparity.

          This is a very serious sentence.  And I think it

F34iahms ag                    SENTENCE

1   properly accounts for all the sentencing factors in the

2   statute.  I don't want to run the risk of imposing a sentence

3   that is so severe on someone who is sufficient a sap, such an

4   incompetent fool.  I don't say that to be mean.  I just say it

5   because it's true.  I worry that at some point the severity of

6   the sentence looks like cruelty or it looks like some judge who

7   just wants to grandstand for his own reasons.  And I don't want

8   to do that.  I don't want to run the risk of promoting

9   disrespect for the law either by Mr. Ahmed or his family or

10  anyone else for that matter.  And I don't think that a sentence

11  in excess of the 42 months affords any significantly greater

12  deterrence to criminal conduct.  The statute talks about

13  adequate deterrence.  And I think that 42 months affords

14  adequate deterrence.

15          At the same time, anything less than the 42 months

16  would not adequately reflect the serious nature of seeking to

17  corrupt and actually corrupting an FBI agent occupying a highly

18  sensitive public position, especially when that behavior is

19  compounded by a willful attempt to obstruct the administration

20  of justice in this case.

21          I well add the following, that the sentence I intend

22  to impose is sufficient but not greater than necessary to

23  comply with the purposes of sentencing set forth in the statute

24  whether or not Individual 1 is deemed an official victim.  In

25  other words, I'm taking into consideration all of the facts

F34iahms ag                    SENTENCE

relating to Mr. Wazed and what Mr. Ahmed was trying to do and

the effect that it had on Mr. Wazed and his family.  I don't

believe that he's an official victim.  We get hung up on

terminology sometimes which is why the current system is far

better than the system that existed pre*Booker*.  We still have

to look at the guidelines as guidelines, a recommendation for

what's appropriate.  And that's exactly what I'm doing here.

        But after I've considered all of these factors

including all the facts relating to Mr. Wazed and after I've

taken them all into account I feel that the sentence that I

intend to impose, 42 months, is the appropriate sentence, and

that would be true even if I were to apply the two-level

sentencing enhancement under the official victim provision.  So

either way the sentence would be 42 months.

        Does either counsel know of any legal reason why the

sentence should not be imposed as stated?

        MS WOODS:  No, your Honor.

        THE COURT:  Mr. Henry?

        MR. HENRY:  No, your Honor.

        THE COURT:  Mr. Ahmed, please stand.

        It is the judgment of this Court that you be committed

to the custody of the United States Bureau of Prisons for a

total term of 42 months to be followed by two years of

supervised release.  The standard conditions of supervised

release 1-13 shall apply.  The following mandatory conditions

F34iahms ag                    SENTENCE

1    shall also apply.  They're on page 27 of the presentence

2    report.  I need to read them into the record.  The defendant

3    shall not commit another federal, state or local crime.  The

4    defendant shall not illegally possess a controlled substance.

5    The defendant shall not possess a firearm or destructive

6    device.  The defendant shall refrain from any unlawful use of a

7    controlled substance.  The mandatory drug-testing condition is

8    suspended based on the Court's determination that the defendant

9    poses a low risk of future substance abuse.

10           The following special conditions shall apply.  The

11   defendant is to report to the nearest Probation Office within

12   72 hours of his release from custody.  And the defendant shall

13   be supervised by his district of residence, meaning that if his

14   residence is in Connecticut, he'll be supervised by the

15   District of Connecticut.

16           I am not imposing a fine because the defendant does

17   not have the ability to pay a fine.  Restitution is not

18   applicable here.  I am imposing the mandatory special

19   assessment of one hundred dollars per count for a total of two

20   hundred dollars which is due immediately.

21           The foregoing constitutes the sentence of the Court.

22           You may have a seat, sir.  Mr. Ahmed you have the

23   right to appeal your sentence subject to any limitations on

24   that right contained in your plea agreement with the

25   government.  If you are unable to pay the cost of an appeal you

F34iahms ag                    SENTENCE

1    may apply for leave to appeal without payment of costs.  A

2    notice of appeal must be filed within 14 days after the entry

3    of judgment.  Therefore, if you do wish to appeal, you must

4    advise your attorney to prepare and file a notice of appeal

5    immediately, or if you request, the clerk will immediately

6    prepare and file a notice of appeal on your behalf.

7            There are open counts in which the defendant is named,

8    I believe it's Counts 1, 5 and 6.  Does that sound right,

9    Ms Woods?

10           MS WOODS:  Yes, your Honor.  We ask that those counts

11   be dismissed.

12           THE COURT:  Any objection?

13           MR. HENRY:  No objection, your Honor.

14           THE COURT:  Counts 1, 5 and 6 are dismissed on the

15   government's motion.  Mr. Henry, do you have suggestions that I

16   include in the judgment in terms of recommendations to the BOP?

17           MR. HENRY:  We'd ask that he be placed at a facility

18   as close to his home in Danbury, Connecticut as possible.

19           THE COURT:  I will do that.  Any other recommendations

20   to the BOP?

21           MR. HENRY:  We'd ask that he get credit for time

22   served.

23           THE COURT:  He will get credit for time served because

24   he was in custody only on this case.  By operation of law he

25   will get that.  I know there's been discussion in the past

F34iahms ag                    SENTENCE

1   about whether Mr. Ahmed should be released on bail.  I don't

2   remember all the details but we certainly discussed that on a

3   prior occasion and I did grant his application to be released.

4   My understanding is that he's been fully compliant with all the

5   conditions of his release since then.

6           Are you asking that the defendant be given a surrender

7   date?

8           MR. HENRY:  Yes, your Honor.

9           THE COURT:  What's the government's position on that?

10          MS WOODS:  The government certainly considered

11  objecting to self-surrender, given both the nature of the

12  offense, the length of the sentence, as well as Mr. Ahmed's

13  demonstrated willingness to lie not just to investigating

14  agents but to this Court in this case.  In addition, as your

15  Honor will recall, he has close family contacts in another

16  country in which he speaks the language to which he could flee.

17  And I think it was a day before his arrest he had booked a

18  flight out of this country.  All of that is reason for concern

19  in the government's view.

20          However, if the Court is inclined to grant

21  self-surrender in this case, the government would request that

22  it be a brief period of time.

23          THE COURT:  It has to be long enough to let the Bureau

24  of Prisons do what it has to do, which is to figure out where

25  to put him.  I don't have to wait for the Bureau of Prisons to

F34iahms ag                    SENTENCE

```
 1   designate an institution I guess, I could order him to
 2   surrender to the marshals.  Ordinarily, if we're allowing
 3   someone to stay out pending designation, the period of time
 4   conventionally is 45 days.  That would get us to about April
 5   20th.  What exactly are the conditions?  Putting aside -- the
 6   home was put up, his parents co-signed?
 7              MR. HENRY:  I believe that's correct.  I think it's a
 8   hundred thousand dollar cash bond was put up as well.
 9              THE COURT:  Who put that up?
10              MR. HENRY:  I believe his parents and his brother.
11              THE COURT:  They sure wouldn't want to lose that
12   money.
13              MR. HENRY:  They certainly don't want to lose that
14   money.
15              THE COURT:  Does he have any kind of electronic
16   monitoring?
17              MR. HENRY:  Yes, he has the monitoring.
18              THE COURT:  He's got basically a curfew which is
19   enforced with the electronic monitoring?
20              MR. HENRY:  That's correct.
21              THE COURT:  Ms Woods, do you want to say something
22   further?
23              MS WOODS:  No, your Honor.
24              THE COURT:  I'm going to grant the application.  I'm
25   going to allow the defendant to self-surrender to an
```

F34iahms ag                    SENTENCE

1    institution to be designated by the Bureau of Prisons on April

2    20, 2015 at two p.m.  So bail will be continued under the

3    current conditions until then.

4              Mr. Ahmed, what that means is that you're still on

5    bail.  That hasn't changed.  You're still obligated to comply

6    with all of the conditions of release that have previously been

7    set.  I'm confident that you will comply and that you won't do

8    anything stupid.  When I say stupid, I mean stupid in terms of

9    disregarding orders of the Court, but also stupid in the sense

10   of disregarding the support and faith that your family and

11   friends have shown in you.  That would be unbelievable -- I

12   mean people do stupid things of course, but I would hope that

13   you've thought about this and realize the consequences for your

14   behavior are serious.  Like going out to eat in a restaurant,

15   when the check comes you got to pay the check.  Now it's time

16   to pay the check.  This is hardly a surprise, it should not be

17   a surprise to you that the check for this particular meal is

18   pretty expensive and you've got a lot of payment to make.

19   Don't make the situation worse by violating my confidence or

20   betraying my confidence in you and betraying the confidence

21   that your family has shown in you.  Do you understand all that?

22   You need to be fully compliant with all the conditions of your

23   release up until now and you need to show up at the Bureau of

24   Prisons institution designated and you'll get notice of that on

25   April 20th at two p.m. wherever that is.  That could be

F34iahms ag                    SENTENCE

1  somewhere else in the country and you're going to have to

2  figure out a way to get there, okay?

3          THE DEFENDANT:  Yes.

4          THE COURT:  I always like to add one thing at the end

5  which is, especially in situations where I just think the

6  conduct is just so not only criminal but it's so foolish, it's

7  so absurd and tragic.  It's tragic for you but not just you.

8  It hurts other people.  It hurts your family, it hurts the FBI,

9  it hurts the process.  It's just bad on so many levels.  And

10  it's just tragic.  And I do wish you the best of luck.  Believe

11  me, nothing that I've said was said for the purpose of

12  demeaning you or being cruel.  I'm just trying to speak the

13  truth as I see it and I think that the consequences of what

14  you've done are serious and you need now to pay your debt for

15  that.  So good luck to you.  We're adjourned.

16          THE COURTROOM DEPUTY:  All rise.

17          This Court will be in recess.

18          (Record closed)

19

20

21

22

23

24

25