F34ithas ag                    SENTENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          13 Cr. 616 VB

5   JOHANNES THALER,

6                   Defendant.

7   ------------------------------x

8                                           March 4, 2015
                                            10:05 a.m.
9                                           White Plains, N.Y.

10  Before:

11                  HON. VINCENT L. BRICCETTI,

12                                          District Judge

13                      APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    BENJAMIN ALLEE
16  EMILY RAE WOODS
         Assistant United States Attorneys
17
    FEDERAL DEFENDERS UNIT
18       Attorney for Defendant
    JASON SER
19

20  KERWIN JOHN, DOJ

21  Also Present: SAJEEB WAZED JOY

22
                        SENTENCE
23

24

25

F34ithas ag                    SENTENCE

1              THE COURTROOM DEPUTY:  United States v. Johannes

2    Thaler.  Will counsel please note their appearances.

3              MR. ALLEE:  Benjamin Allee and Emily Rae Woods for the

4    government.  With us is Special Agent Kerwin John.

5              MR. SER:  Federal Defenders by Jason Ser for

6    Mr. Thaler.  With me is paralegal Dana Krausher from our

7    office.

8              THE COURT:  Okay, good morning.  Have a seat.  This

9    matter is on for sentencing today, the defendant having pleaded

10   guilty to aiding and abetting the bribery of a public official,

11   namely FBI Special Agent Robert Lustyik, and also pleaded

12   guilty to conspiracy to committing wire fraud and honest

13   services fraud.

14             I've reviewed the following materials in preparation

15   for sentencing.  Presentence report dated January 8, 2015,

16   prepared by Probation Officer Sarah Willette.  Plea agreement

17   dated October 15, 2014.  Defense counsel sentencing memorandum

18   dated February 25, 2015, as well as a number of letter and

19   other materials attached thereto including a letter from the

20   defendant.  And also I reviewed the government's sentencing

21   memo dated March 2, 2015 as well as the government's letter of

22   March 3, 2015.  I will consider the government's sentencing

23   memo not withstanding it was submitted untimely.  I'm was very

24   clear at the time of the guilty plea that any sentencing

25   submission by the government had to be submitted at least three

F34ithas ag                    SENTENCE

1    days in advance of sentencing for the simple reason that I need

2    to read these things, and it's particularly relevant in a case

3    like this where the government's sentencing memo is 19 pages

4    long and they had several months to prepare it and plenty of

5    time to prepare it after the defendant's memorandum was

6    submitted in a timely fashion.  In any event, I have reviewed

7    it and will consider it.  In addition I received a letter from

8    the government on March 3rd essentially withdrawing one of the

9    requests made in the sentencing memorandum.  So I've reviewed

10   that as well.  Has anything else been submitted that I failed

11   to mention?

12            MR. ALLEE:  No, your Honor.

13            MR. SER:  No, your Honor.

14            THE COURT:  Mr. Ser, have you read the presentence

15   report and discussed it with your client?

16            MR. SER:  I have, your Honor.

17            THE COURT:  Mr. Thaler, have you read the presentence

18   report?

19            THE DEFENDANT:  Yes, I have, your Honor.

20            THE COURT:  Have discussed it with your attorney?

21            THE DEFENDANT:  Yes, I have.

22            THE COURT:  Mr. Allee, have you read the presentence

23   report?

24            MR. ALLEE:  Yes, your Honor.

25            THE COURT:  Let me just state the guidelines

F34ithas ag                    SENTENCE

1    calculation as set forth in the presentence report.  There are

2    some issues that we need to address.  Let me just put on the

3    record what the PSR says regarding the guideline ranges.  First

4    of all, the base offense level is 12 under 2C1.1(a)(2).  Again

5    I'm not making a finding just yet.  Two-level upward adjustment

6    because the offense involved more than one bribe, that's

7    guideline section 2C1.1(b)(1).  Ten-level upward adjustment

8    because the value of the payments to be obtained by the public

9    official was in excess of $120,000.  That's 2C1.1(b)(2), and a

10   cross-reference to 2B1.1(b)(1)(F).  A four-level upward

11   adjustment because the offense involved a public official at a

12   high level or sensitive position.  2C1.1(b)(3).  A three-level

13   upward adjustment because the victim, who is identified as

14   Individual Number 1, was a member of the immediate family of a

15   government officer or employee and the offense was motivated by

16   such status.  That's 3A1.2(a)(1)(C) and 3A1.2(a)(2).  There's a

17   two-level downward adjustment because the defendant was deemed

18   to be a minor participant and a three-level downward adjustment

19   for acceptance of responsibility such that the final offense

20   level is 26 at Criminal History Category I based on one

21   criminal history point.  And therefore according to the

22   presentence report the sentencing ranges is 63 to 78 months

23   imprisonment, the supervised release range is one to three

24   years, and the fine range is $12,500 to $125,000.

25            Does the government have any objection to any of the

F34ithas ag                    SENTENCE

1   factual statements in the presentence report?

2          MR. ALLEE:  No, your Honor.

3          THE COURT:  Does the defendant have any objection to

4   any of the factual statements in the presentence report?

5          MR. SER:  No, your Honor.

6          THE COURT:  And I know that you have, we have a

7   dispute about the three-level official victim which we'll

8   address.  You're not waiving that by saying that.  To the

9   extent there are any facts that are set forth in the report

10  relating to that adjustment, the three-level adjustment, I'm

11  assuming that you have an objection to that.  But putting that

12  aside, there are no other disputes as to the facts so the Court

13  adopts the factual statements in the presentence report as the

14  Court's own findings of fact for purposes of this sentencing.

15         Does the government have any other objections to the

16  presentence report or its guidelines calculation?

17         MR. ALLEE:  No, your Honor.

18         THE COURT:  And I know that the defendant has an

19  objection to the three-level official victim enhancement.

20  Other than that, does the defendant have any objections to the

21  presentence report or its guidelines calculation?

22         MR. SER:  No, your Honor.

23         THE COURT:  All right.  Let's address the issues at

24  this time.  First of all, I know that the parties have agreed

25  that the offense involved more than one bribe such that there

F34ithas ag                SENTENCE

is a two-level upward adjustment.  I'm just curious, I'm just

asking counsel, you've agreed on it so presumably you have a

basis for that agreement, but why do you think there was more

than one bribe here when in fact there only was one bribe

actually paid?

          MR. ALLEE:  Yes, your Honor.

          THE COURT:  And it could be Mr. Ser too, because he's

agreed to this, I'm not picking on you, Mr. Allee.  I want to

know factually what the basis of this is because although you

stipulated to it I'm not bound by the stipulation.

          MR. ALLEE:  Of course, your Honor.  We have agreed to

it and we're in a position to prove that the bribery scheme of

which Mr. Thaler is guilty included not only the exchange of

the money that actually happened but an agreement regarding an

ongoing course of conduct involving the dissemination and

disclosure of information that co-defendant Lustyik had access

to at the FBI over time on a number of issues all relating to,

in one way or another, what you can describe I guess as

Bangladeshi politics or politicians, but not limited to one set

of disclosures or even one issue, having to do with different

people, having to do with different topics for those different

people over a span of several months going in one direction.

And in the other direction, while there was only one payment

actually made, there was an agreement and discussion of several

more payments to be made which ultimately became an agreement

F34ithas ag                    SENTENCE

1    for a $40,000 retainer and $30,000 a month.  Of course, that

2    never happened, we've talked about it before your Honor, that

3    there came to be an impasse or a game of chicken over whether

4    the information would go out first --

5           THE COURT:  The phrase "show me the money" comes to

6    mind.  One might substitute show me the documents before I give

7    you the money comes to mind.  It broke down and they never

8    actually made those payments.

9           MR. ALLEE:  Yes.  And no one was saying "help me help

10   you" to spin that out.  That enhancement applies when there is

11   a series of transactions involving multiple bribes, multiple

12   changes of information.  That enhancement, we looked hard at it

13   and I know Mr. Ser looked hard at it, we agree that that

14   enhancement wouldn't apply, there are cases even where there

15   are multiple bribes where that enhancement wouldn't apply if

16   they are installment payments.

17          THE COURT:  The guidelines specifically say that.

18          MR. ALLEE:  Our position is that that was not the

19   scheme here.  That's not what was discussed between the

20   parties.  We're prepared to prove this was not installment

21   payments towards one corrupt act or even a series of corrupt

22   acts all bound up in one person.  There was an agreement here.

23   There was a scheme of which the defendants have been convicted

24   that included the intent to pay multiple bribes for multiple

25   disclosures of information on a series of issues.  Therefore,

F34ithas ag                    SENTENCE

1      the enhancement applies.

2              THE COURT:  Mr. Ser, you agree with that, you agree

3      the enhancement applies?

4              MR. SER:  We agreed in the plea agreement that the

5      enhancement applies.  That's what the plea agreement says, your

6      Honor.

7              THE COURT:  I'm going to honor that agreement because

8      I know that counsel in this case on both sides are highly

9      competent.  I also know that there's an institutional

10     incentive, meaning the institution being the court, to honor as

11     often as humanly possible plea agreements and particularly

12     stipulations of fact that give rise to guidelines calculations

13     because the last thing in the world the Court wants to do is

14     send a message to the bar that they can work hard to resolve

15     cases by guilty plea which include a stipulated guidelines

16     range only to have that overturned by a judge who almost always

17     is less familiar with the facts and circumstances of the case

18     than counsel is.  So I'm not going to -- I'll put it in the

19     affirmative.  I'm honoring that agreement.  There is a

20     two-level adjustment.

21              However, I did want to ask both of you, because it is

22     an agreement that you both entered into, about the statements

23     in the government's brief at pages 4 and 5, at the bottom of

24     the page.  On December 16, 2011 Thaler and Ahmed agreed, that's

25     an important word, agreed to a contract arrangement whereby

F34ithas ag                        SENTENCE

1    Ahmed and his associates would pay Lustyik and Thaler a $40,000

2    retainer fee and $30,000 per month in exchange for additional

3    information, etc.  Then there's a quote from what I think are

4    text messages, am I right, Mr. Allee?

5          MR. ALLEE:  Yes, your Honor.

6          THE COURT:  That's not a voice recording, these are

7    text messages.

8          MR. ALLEE:  Correct, your Honor.

9          THE COURT:  It just doesn't say that explicitly.  It

10   says that Mr. Thaler evidently in a text message says why don't

11   we just do the contract, 40 up front, 30 monthly, etc.  And

12   Ahmed says that's fine.  And I guess at that point the

13   government and the parties at that point agree that an

14   agreement was made with the term "that's fine."  But then it

15   goes onto say but they have to have some idea of what you have.

16   They aren't going to sign something, which suggests that it's

17   not fine, not knowingly and give you the money.  "I don't need

18   any documents or anything.  Just give me some idea what exactly

19   you have on them.  The last documents you gave me about three

20   hundred millions dollars, how far that investigation went and

21   what they found.  Give me some idea and I will get you that

22   contract!!!"  And then Thaler says:  "Okay.  I'll let you

23   know."  And Ahmed says:  "I'm working for you and myself."  By

24   the way, I'm interpreting the shorthand way in which people

25   speak in text messages.  But it clearly says "I'm working for

F34ithas ag                    SENTENCE

1   you and myself.  If this works out I will be the hero to my

2   party!!!"  Mr. Thaler says:  "We can make that happen."  And

3   Ahmed says:  "Get me some info on --" three and six zeros which

4   I guess, well, three followed by six zeros which is three

5   million, and then it's followed by the word "mil file.

6   Thanks."

7          My question is is that the text message which supports

8   the conclusion that an agreement was made to pay additional

9   bribes, and also is that the basis for the next question that I

10  have which is with respect to the ten-level enhancement for the

11  value of the payments to be obtained?  Or is there something

12  more?

13         MR. ALLEE:  That is part of the basis, your Honor.

14  The texts in our brief continue, your Honor.

15         THE COURT:  Yes, they do.

16         MR. ALLEE:  On page 5 we quote ensuing texts that

17  follow between Lustyik and Thaler.  Lustyik writes:  "So, how

18  much is this contract with Caesar" referring to Mr. Ahmed.

19         THE COURT:  But that's between two people on one side

20  of the deal, not between both parties to the deal, right?  So

21  if I'm entering into a contract with you and it affects

22  somebody else that I'm working with, that other person and I

23  may talk about it but that only reflects conversations that he

24  and I are having.  It doesn't necessarily reflect the

25  conversations that you and I are having.  Because you and I are

F34ithas ag                    SENTENCE

1   on the opposite ends of this deal.  In this case Ahmed is on

2   one side, Lustyik and Thaler are on the other side.  Just

3   referring to conversations between Lustyik and Thaler doesn't

4   in and of itself, although it's suggestive but it doesn't in

5   and of itself show some actual agreement that was entered into

6   between Lustyik-Thaler on one side and Ahmed on the other side.

7   So what you're citing to is just Lustyik Thaler.

8              MR. ALLEE:  Yes, your Honor.  Our position is that

9   that's actually very powerful proof of the agreement itself.

10  That's two of the three participants in the agreement candidly

11  discussing what it is.  Perhaps Thaler wasn't giving the

12  straight dope to Lustyik but this is pretty good proof, they're

13  texting the next day, Lustyik says what is it, and Thaler says

14  our original terms, it says 40 retainer and 30 monthly which we

15  interpret to mean 40,000 and 30,000 dollars respectfully and

16  then Thaler describes what is being sought.

17             Again, we agree that that didn't happen, that money

18  didn't come forward.  We have proof about efforts to collect

19  that money, some money was collected although not then

20  disbursed through to Thaler and Lustyik.  But our position is

21  actually that those texts are powerful proof of the agreement.

22             THE COURT:  Let me stop you.  I'm going to honor the

23  agreement both in terms of the number of bribes and the amount

24  of the payments to be obtained because again, this is a

25  contract entered into between highly competent, experienced

F34ithas ag                    SENTENCE

 1   counsel and I'm not going to upset that.  But another way to

 2   interpret these texts -- this is not the entire trial, this is

 3   just a handful of texts, I get it -- the reason why I'm going

 4   to do that is because I don't presume, I really don't presume

 5   to know anywhere near as much about this case as you and

 6   Mr. Ser and Mr. Thaler do.  I just don't.  How could I

 7   possibly.  But another way to interpret this, Thaler, who I'm

 8   told is a salesman, that's what he does for a living, is trying

 9   to sell both sides on this deal, that he's the middleman and

10   he's trying to tell Ahmed, look, we got some really great

11   stuff, it's highly valuable, so valuable that you ought to pay

12   us tens of thousands of dollars a month over some indefinite

13   time period.  And at the same time when Ahmed says well, yeah,

14   okay, but you got to show me the information first before I

15   start paying you the money, it sounds good, but before we make

16   that final deal, let's have some further, I mean show me

17   something first.  You showed me a little stuff, but not a lot

18   and I want to see some more because somebody is funding this

19   and until you show me more, I can't really get -- make this

20   happen.  So that's the conversation on one end.  And then

21   Thaler, being a good salesman, trying to capitalize on his

22   relationship with his other friend, Lustyik, to monetize his

23   friendship with Lustyik says to Lustyik, yeah, we got the deal,

24   original terms, 40 up front, 30 every month thereafter.  That's

25   not exactly what the text messages that you quote between Ahmed

F34ithas ag                    SENTENCE

1    and Thaler say.  It is not.  It just isn't.

2              I understand your point, which is that you got to read

3    all the communications, you got to consider all the evidence,

4    and if the case went to trial, if this were an issue at trial,

5    I'm not sure it exactly would be, but if it were, the

6    government feels it could show that there was actually an

7    arrangement that was actually agreed to for actual payments

8    over a period of time as opposed to here's a couple of

9    documents, confidential and highly sensitive documents which

10   under no conceivable -- which had no conceivable legitimate

11   purpose to be disclosed by a senior FBI agent acting in a

12   counter intelligence capacity, that he would know that, that

13   Thaler would know that, that Ahmed would know that.

14             Don't mistake anything I'm saying as a suggestion that

15   I don't think this is a matter of the utmost seriousness,

16   because it clearly is.  It's just that these texts that you're

17   citing, and which you've given to me so presumably you're

18   giving me the best texts you have, you don't have something

19   else that's even better that you didn't tell me about, they are

20   susceptible to more than one meaning.  That's all I'm saying.

21   And you say, well, in an adversarial context perhaps that's

22   true, but we believe they mean that they made a deal for this

23   amount of money looking forward and in any event we've entered

24   into a formal agreement to that effect with defense counsel so

25   that's the end of it.

F34ithas ag                    SENTENCE

1           MR. ALLEE:  Yes, your Honor.  Can I add two more

2   points which relate to what your Honor has said?

3           THE COURT:  Sure.

4           MR. ALLEE:  The first is there are other ways --

5   you're right, these texts we're submitting, these are primary

6   proof on this point.

7           THE COURT:  And they're powerful proof of a blatant,

8   corrupt bribery scheme.  So please don't mistake anything I'm

9   saying for anything other than that.  I'm just trying to figure

10  out, because the guidelines require me and the Supreme Court

11  requires me to actually calculate the guidelines.  And we all

12  say, how many times have you heard a judge say this agreement

13  is not binding on me.  It's binding on the parties but not me.

14  Those two things we all agree on.  I have to figure it out and

15  the agreement is not binding on me.  So I'm just trying to

16  figure out what the guideline range is.

17          MR. ALLEE:  Which, of course, you must do regardless

18  of what we agree to.  I want to point out something that you

19  have said but I want to say it in a different way.  Aside from

20  the texts, just one piece of corroboration for this which is

21  much more a 30,000 foot level.  What was happening here is the

22  corruption through bribery of an FBI agent to the point where

23  Lustyik, to the point where he was violating his oath and

24  betraying a lot of sacred things.  That's very valuable.  So

25  the notion that there would be a payment of 40,000 and then

F34ithas ag                    SENTENCE

1   30,000 a month is corroborated by the fact that it was worth,

2   that that was worth that.  This is not a drug case with a kilo

3   and this is a sting by the government and they've inflated the

4   numbers.  There's not a mismatch between the value of what's

5   being offered on one side and then the discussion of what's

6   going to be paid on the other.  That actually is pretty

7   corroborative.  It is worth a lot of money to get an FBI agent

8   of 24 years in counter intelligence to do this.

9              THE COURT:  You're right.  But the only problem with

10  that is that everything you said is correct but the only

11  suggestion to the contrary is that they didn't actually pay the

12  money.  So at the end of the day they apparently decided well,

13  whatever it is that they, meaning Thaler and Lustyik, are

14  telling us or telling me, Ahmed, because he's the only other

15  defendant in the case, whatever Lustyik and Thaler are telling

16  me, even though I thought it might be worth perhaps hundreds of

17  thousands of dollars, I'm not so sure anymore and I'm just not

18  going to do it.  Because Ahmed never said, look, this is

19  unbelievably fantastic information worth every penny, it's just

20  that I don't have the money so I'm sorry, I wish I could.  And

21  I know I agreed to do this but I'm not going to do it because I

22  don't have the money.  He never said that.  They just didn't do

23  it.  At least the text messages don't say that.  Maybe they did

24  say that amongst themselves.  But the text messages don't say

25  that.

F34ithas ag                    SENTENCE

1           MR. ALLEE:  Right, your Honor.  The other point I want

2    to make, I'm going back to something you said earlier but I

3    want to make more concrete what I said, how this was a series

4    of multiple disclosures on multiple issues, just so that point

5    is not as vague as I left it.  We've described that the

6    disclosures included documents about an individual identified

7    as Individual 1 in the indictment.  The documents went out.

8    That's actually where the thousand dollars came back.  And

9    there's other information disseminated about that individual

10   over time that was not in documents that was described orally

11   or in e-mails.  Then there was another aspect of it which was

12   there's another individual, a Bangladeshi individual about whom

13   Lustyik, this is someone allied with Ahmed, Lustyik described

14   that he was willing to, in exchange for payment, for bribe,

15   assist in interfering with the investigation of that

16   individual.  That individual is being investigated in an

17   international investigation.  Lustyik offered his services in

18   getting information about the investigation and potentially

19   interfering with it.  I want to make concrete that there were

20   multiple, that's one reason for that enhancement, there were

21   multiple things going on here.  It wasn't just one set of

22   payments for one set of disclosures.

23           THE COURT:  The bottom line is I am honoring the

24   agreement both on the plus two for more than one bribe and the

25   plus ten for the value of the payments to be obtained.  This is

F34ithas ag                    SENTENCE

1    helpful because while the guidelines of course are very

2    important, they are at the end of the day advisory, and my job

3    is to figure out the appropriate sentence, not necessarily the

4    one that's recommended by the guidelines.  So all of these

5    facts are relevant to that, both the facts that support the

6    general notion that this was a grotesque scheme, which it was,

7    and all the participants knew that, but also the fact that at

8    the end of the day, when the dust was settled and everything

9    was done, a total of a thousand dollars was paid to, sometimes

10   I see it as three, but two documents were exchanged, some other

11   information was provided and then the parties basically faded

12   away or they walked away from each other relatively soon after

13   these text messages.  Those facts are all relevant to this

14   case.

15            So I do adopt both the, as I said, the plus two for

16   more than one bribe and the plus ten for the value of the

17   payments to be obtained.

18            Here's another question for you before we get to the

19   one that's really in dispute.  Here's another one that -- well,

20   minor participant.  The parties have agreed that Mr. Thaler is

21   entitled to a two-level downward adjustment for minor

22   participant under 3B1.2(b).  And I'll just quote one sentence

23   from your brief, Mr. Allee.  It says:  "Thaler was a critical,

24   irreplaceable participant without whom the bribery scheme would

25   have never happened."  Let me start over again.  This is on

F34ithas ag                    SENTENCE

1     page 17.  "Thaler was a critical, irreplaceable participant

2     without whom the bribery scheme would never have happened let

3     alone grown.  Thaler alone had the trust of and access to

4     Lustyik to accomplish the crime and to put Lustyik together

5     with those who would and did bribe him."

6              How do you square those statements, which I assume you

7     mean, with agreeing to a minor role adjustment?  I'm really

8     struggling with that one.  As I say, I'm telling you right now

9     I'm going to honor that agreement for all the reasons I said

10    earlier, institutional and otherwise.  Tell me how that squares

11    with the minor role adjustment.

12             MR. ALLEE:  Yes, your Honor.  We do think that there

13    is a complete harmony between those characterizations.  The

14    three participant in the scheme played different roles.

15    Lustyik, we agree, played as significant a role as you can pay.

16    He was the corrupted agent here.

17             THE COURT:  You don't have to belabor that point.

18             MR. ALLEE:  On the other side, Ahmed is the person who

19    was motivated to get the document, the person who is gathering

20    cash to pay for the documents who was sort of driving that

21    purpose of this disclosure.  And Thaler was in between.  In

22    that sense, when you compare the roles of these three

23    participants, Thaler is minor in the ordinary sense of the

24    word.  And when you read the guidelines he's a minor

25    participant.  When you read cases about minor participants his

F34ithas ag                    SENTENCE

1    role is just so comparatively less than his co-defendants.

2            THE COURT:  How would Ahmed have ever met Lustyik if

3    it weren't for Thaler?

4            MR. ALLEE:  He would not have.

5            THE COURT:  So isn't Thaler critical to that

6    relationship?

7            MR. ALLEE:  Maybe this is a language point.  Our view

8    is you can be a minor participant and critical, that's what

9    happened here.  Probation seemed to take the position, I don't

10   want to over interpret it but Probation recommends a 15-month

11   sentence and uses the word "conduit" in its recommendation

12   section, which is completely accurate.  Thaler was a conduit.

13   If that word or concept is meant to suggest replaceability or

14   just some sort of cog in a wheel that anything could have

15   filled, that's not the case.  You can certainly be a minor

16   participant but irreplaceable.  You can be critical and minor.

17   If there was someone that Lustyik trusted as much as Thaler, he

18   could have been replaced, but that's not the case.

19           THE COURT:  Okay.  I'm going to honor that.  I

20   appreciate the government's, the stand-up nature of what

21   Mr. Allee is saying right now because he is unequivocally

22   standing by the agreement that he made and that's a good

23   quality to have if you're a prosecutor.  But number three, I

24   will say that if this were a litigated question, I have a hunch

25   that the government would take a different position, just a

F34ithas ag                    SENTENCE

1  hunch.  I guess that's a poor thing to say.

2          Back in the pre*Booker* days, with which I'm familiar,

3  one of the problems with the guidelines that was perceived by

4  me, but not just me but by lots of people, was that they were

5  so rigid that in order to facilitate plea discussions and

6  guilty pleas without which the system would collapse of its own

7  weight, the parties in good faith, not in bad faith, in good

8  faith, would agree to things in order to reach a result which

9  everybody knew was not really what the facts would support.  An

10  example would be, I know this from personal experience, a fraud

11  case.  It's a million dollar fraud case, but everybody wants to

12  plea, there's no bad faith here and the government says look,

13  we'll agree that the amount of the loss was $250,000.  But if

14  you don't plead guilty and you go to trial we're going to take

15  the position that it's a million dollars.

16          In a way that sort of makes no sense, right, because

17  it's either a million dollars or it's 250.  Which is it?  How

18  can you agree to it being 250 and if it's really a million.

19  Another example would be weight of drugs.  The conspiracy

20  involves ten kilograms but if you take a plea, we'll agree it's

21  500 grams.  Or another very common sort of bargaining chip was

22  role.  So the government says we think your client was not a

23  minor participant as that term is defined but you take a plea

24  by next week we'll agree he's a minor participant.

25          One of the objectives of the guidelines was to insure

F34ithas ag                    SENTENCE

1    truth in sentencing, in other words, that somebody should be

2    sentenced for what they did.  Of course that's easier said than

3    done because human beings have difficulty with absolute truth.

4    They're pretty good at meeting burdens of proof and calling

5    witnesses and laying foundations for documents and

6    cross-examining witnesses and whatever the case may be, but

7    all-knowing and all-seeing is something that's beyond human

8    capability.  So to say that we're just going to sentence people

9    for what they did sounds good, but it's hard to achieve just in

10   the practical everyday real world of the courtroom.  And the

11   problem with what was going on then was that it seemed to

12   foster dishonesty which is the opposite of what the guidelines

13   were supposed to do.  That parties were quite explicitly

14   agreeing to things which they knew were not true in good

15   faith -- that's the weird part about it, not in bad faith, but

16   in good faith -- in order to achieve a fair and just result.

17          To me this has the appearance of that, to be brutally

18   honest.  Although we're no longer pre*Booker*.  To me it seems to

19   me this was a bargaining chip.  All right, we'll take the plea

20   but at least give me a two-level minor role adjustment.

21          I'm not going to reject it, I'm not.  But I have to

22   look at what I think I understand to be what actually happened,

23   and there's no question that what actually happened is that

24   Thaler was really an important player in this process because

25   he had these two pals, one at the mall and one at the FBI.  And

F34ithas ag                    SENTENCE

1    he, it's not entirely clear how this happened, but somehow he

2    learned that the mall friend was into this whole political

3    thing in a foreign country and suggested to him you know what,

4    I think I might be able to help you.  Of course, it's going to

5    cost you, I'm not going to do it for free.  But I've got this

6    other friend and he's a guy that might be able to help you but

7    not for free.  There's a value that we're going to place on

8    this.  And then he goes to the other friend and he says, to his

9    FBI agent friend and he says:  Listen, there's a guy who I know

10   who is willing to pay us, plural, us, a whole bunch of money

11   for stuff that he thinks is important.  I don't even know what

12   he's talking about, I never even heard of Bangladesh -- I'm

13   making that up, maybe he has -- but it's a country somewhere in

14   Asia and evidently this mall friend of mine would be willing to

15   pay and has the ability to pay large sums of money for

16   information that he could use in some way.

17            Minor role?  How did you get to minor role on that?  I

18   picked on Mr. Allee, now I'm going to pick on you.

19            MR. SER:  Sure, your Honor.

20            THE COURT:  That doesn't sound that minor to me.  It

21   sounds kind of important.

22            MR. SER:  Having come from a district in southern

23   California where we have cases where minor role is frequent,

24   things like drug couriers who were mules bringing drugs across

25   the border, mules driving drugs within the United States --

F34ithas ag                    SENTENCE

1          THE COURT:  Come on, this is not a mule case, please.

2          MR. SER:  -- I'm very familiar with the role

3    adjustment laws in place.  You have to be substantially less

4    culpable than the average participant.  And the guidelines

5    discuss things to gauge that such as supervisory capacity,

6    ordering people, things of that nature.  So while Mr. Thaler

7    was, as the Probation Office terms it, the conduit between the

8    two parties, that doesn't change the fact that they all had

9    different roles as Mr. Allee said.  And I think you have to

10   gauge whether he is substantially less culpable relative not to

11   merely the fact that he's a conduit, I think that's one factor

12   the Court can consider, but it has to look also at how the

13   scheme operated, what roles did each of the individual players

14   have.  And fortunately, we're not talking unindicted or

15   uncharged co-conspirators which is very often included in minor

16   role analysis but we have the other two individuals who were in

17   this case.  We have Mr. Lustyik, he's the most culpable.  He's

18   the person in the position --

19         THE COURT:  You won that one.  Doesn't answer the

20   question.

21         MR. SER:  He's substantially less culpable than

22   Mr. Lustyik.  He's also substantially less culpable than

23   Mr. Ahmed because Mr. Ahmed is the one who makes the request.

24   Originally, Mr. Thaler and Mr. Ahmed when they worked together

25   at Macy's at salesmen -- that's how they met.

F34ithas ag                    SENTENCE

1          THE COURT:  I know that.

2          MR. SER:  As the Court's aware, Mr. Thaler was

3    involved in various business activities with Mr. Lustyik and

4    individuals from the Utah case.  And originally he and

5    Mr. Ahmed were discussing the purchase of uniforms and I

6    believe shoes from Bangladeshi factories because Mr. Thaler in

7    this side work he was doing with the individuals from Utah and

8    Mr. Lustyik were trying to create contracts with various

9    governments about supplying things like uniforms and boots.

10   That's how originally he and Mr. Ahmed met and talked.

11         And Mr. Thaler had mentioned that he had a buddy who

12   was in the FBI and kind of gave context to all the players in

13   it.  And Mr. Ahmed asks, wow, my family is involved in politics

14   in Bangladesh.  Can he get me something?  And that's how this

15   whole thing comes about.  It isn't as if Mr. Thaler comes out

16   and says I have a buddy, can I sell you on some more stuff.  He

17   was a salesman but he wasn't pitching this to start.  He's a

18   conduit, not the initiator of this.  Mr. Ahmed is the one who

19   solicited him.

20         THE COURT:  Basically you're saying that his role in

21   this was serendipitous.  It so happened that he was friendly

22   with this guy who happened to be from Bangladesh who he thought

23   might be helpful in some other legitimate business transaction,

24   and the guy from Bangladesh suggests an illegitimate business

25   transaction, and a light bulb went off in his head, maybe I'll

F34ithas ag                    SENTENCE

1   bring this to my buddy Lustyik and see how this plays out.

2              MR. SER:  That was it.

3              THE COURT:  What was his share of the profits supposed

4   to be?

5              MR. SER:  It was supposed to be an even split.

6              THE COURT:  Even Steven.  Is that consistent with

7   minor role?

8              MR. SER:  Your Honor hit it on the head when we

9   started these discussions earlier.  You have to put it in

10  context of what was actually gained from the individuals in the

11  case.  Mr. Ahmed gained $30,000, that's clear from the

12  Probation Report or the government submission.

13             THE COURT:  I'm not sure what that has to do with this

14  case.  Somebody gave him money which he put in his pocket.

15  Indict him for larceny.  That's not what this case is about.

16             MR. SER:  I think that's one of the factors.  Monetary

17  gain, according to, and I cite Hutchinson and an Eleventh

18  Circuit case that really kind of spell out some of the analyses

19  that would apply in the minor role context.  And we have to

20  look at what the other individuals made.  There was a lot of

21  talk but in the end a thousand dollars got exchanged.

22  Mr. Thaler kept 500, 500 went to Mr. Lustyik.  But if we read

23  through everything, the payments from Ahmed were going to

24  Lustyik through Thaler.  I know the split was even but I think

25  that the spirit of the arrangement was that Ahmed was paying

F34ithas ag                    SENTENCE

1    really Lustyik for the documents and Lustyik did agree to split

2    the money with Mr. Thaler.  I don't think Mr. Ahmed is paying

3    Mr. Thaler necessarily.  This is something Mr. Thaler and

4    Mr. Lustyik had discussed.  Everything when it talks about

5    payment discusses it being paid through Mr. Thaler.  While

6    Mr. Lustyik and Mr. Thaler split the thousand dollars evenly, I

7    think Mr. Allee alluded to this earlier, it's the value of what

8    Mr. Lustyik provided as well I think that could factor in.

9              Mr. Ahmed is double-dealing apparently.  He's trying

10   to figure out what he can get without having to give up the

11   money that he's getting from his sources in Bangladesh that was

12   really intended to go to them to get the information.  But

13   Ahmed decides to hold back and pocket it, hoping to get

14   something, and then maybe double gain in the end by getting the

15   documents and not having to part with the money he received.

16             So I think if you compare Mr. Thaler's gain personally

17   from this to Mr. Ahmed, there's a distinct difference.

18   Mr. Ahmed is also in a position where he's the one making the

19   demands.  Mr. Thaler can't fulfill the demands.  And then it

20   shifts back to Mr. Lustyik.  He's the only one who can do this.

21   And the way the scheme progresses during the course of six

22   months, originally it's Mr. Thaler acting as the conduit, but

23   it gets to a point where they're discussing based on this

24   contract series of payments, they now want to meet with the

25   source, they want to meet with the big man as some of the texts

F34ithas ag                    SENTENCE

1    relate.

2              Ahmed says everyone wants to met Lustyik.  He's the

3    one doing this for him.  So eventually what happens is there's

4    a meeting in January at Ahmed's house where Lustyik gives the

5    presentation as to what he can give them and Lustyik becomes

6    the salesman.  And his position makes him the only one who is

7    able to do any of these things.

8              THE COURT:  But Mr. Thaler at that point didn't say I

9    made the introduction, I'm out of here.  Sort of like in a drug

10   case there's an informant working for the government, the

11   informant makes the introduction, and then he walks away and

12   from that point he introduces an undercover agent to the seller

13   or buyer, whatever the case may be, and then he walks away and

14   he's done, he's already been paid, i.e. 50 bucks for working

15   today, or we're going to help you out with your case.  But he's

16   done with the case.

17             But in this case Mr. Thaler was not done.  All these

18   text messages.  Of course Lustyik was the person, the

19   absolutely essential person because he's the one who had access

20   to this information.  But all the text messages between Lustyik

21   and Thaler talk about "we" and "our" and "our thing" and "this

22   is what we want" and "we can make a lot of money" and "our,"

23   "we," "we," "our."  It's not Thaler saying to Lustyik, listen,

24   Bob, you have been my friend by whole life and I know you could

25   make a lot of money.  It's corrupt and all but you know, make a

F34ithas ag                    SENTENCE

1    lot of money, buy me dinner, buy me dinner or send me a hundred

2    bucks or something and you're on your own.  That's not what

3    happened here.

4          Anyway, look, here's the bottom line.  This is helpful

5    because it gives me a broader understanding of the facts and I

6    appreciate what both highly competent attorneys have done in

7    this regard and I am upholding the agreement with respect to

8    that two-level downward adjustment.

9          That gets us to the one that's in dispute.  It's

10   interesting we spent all this time on something that's not even

11   in dispute.  There is a dispute about the three-level upward

12   adjustment under 3A1.2(a)(1)(C).  The government contends and

13   the Probation Department has agreed that this person identified

14   as Individual 1 was an official victim in that he was a member

15   of the immediate family of a government officer, Bangladeshi

16   government officer, and that the offense of conviction was

17   motivated by such status.

18         I'm told, to be fair to you Mr. Allee, that Individual

19   1 is here today.  Were you planning to have him speak?  He's

20   welcome to be here of course, it's a public courtroom, happy to

21   have him.

22         MR. ALLEE:  Yes, your Honor.

23         THE COURT:  What's your plan with respect to this

24   person?

25         MR. ALLEE:  Individual 1 is in the courtroom in the

F34ithas ag                    SENTENCE

1    gallery, your Honor.  We ask that your Honor hear from

2    Individual 1.  We understand he's willing and would like to be

3    heard from by your Honor under Section --

4             THE COURT:  I'm going to hear from him.  I'm not

5    absolutely certain that he is a victim but I'm going to hear

6    from him.  But I'm going to rule on this first.  I'll hear on

7    him after I rule on this.  We're not going to have a hearing.

8    He's not going to be testifying under oath or anything like

9    that.

10            MR. ALLEE:  Let me separate these things out.  The

11   being heard from, that's not in connection with this

12   enhancement.  That's just a lawyer's argument.  I don't think

13   there are any disputed facts.  We're not trying to prove

14   anything.  That's a 3771(d), please, can we hear from the

15   victim.

16            THE COURT:  And I will hear from him.  You don't want

17   me to hear from him before I resolve this question.

18            MR. ALLEE:  Yes, your Honor.

19            THE COURT:  I just wanted to make sure that was what

20   you wanted because I didn't want to not hear from him and have

21   you tell me later on you should have heard from him first.

22            Here's what I'm going to do on this.  I've read the

23   parties' respective positions.  I've read the cases cited which

24   didn't take very long because there aren't very many cases

25   cited.  I've read the Probation Report.  I find that the

F34ithas ag                    SENTENCE

1    official victim enhancement does not apply under the

2    circumstances of this case.

3            First of all, in my view it's illogical to apply this

4    enhancement in a bribery case.  The victim in an official

5    corruption case like this is the public itself because the

6    bribery of a public official is intended to and in fact does

7    compromise the integrity of that official.  There's no doubt

8    about it.  The public, the United States if you will, even the

9    FBI, are victims in this case.  The confidential information

10   that was disclosed in documentary form and otherwise, not just

11   documentary form,  belonged to the FBI.  It didn't belong to

12   Mr. Lustyik, it didn't belong to Mr. Ahmed, it didn't belong to

13   Mr. Thaler, it belonged to the FBI and by extension the people

14   of the United States.  And that was what was disclosed in

15   return for the bribe.

16           So to me, the victim is the United States and the FBI,

17   but more generally the public, public meaning U.S. citizens,

18   not citizens of other countries.  But I don't see how any

19   individual in this particular case for these particular

20   offenses -- in other words, the offenses of conviction are

21   aiding and abetting the bribery of a public official and

22   conspiracy to commit honest services fraud.  Those are the

23   offenses of conviction.  I don't see how any individual was the

24   victim of these offenses of conviction.  And of course 3A1.2

25   only applies to victims who are individuals.

F34ithas ag                    SENTENCE

1              The government's argument is that the son of the Prime

2      Minister of Bangladesh is the victim, we'll call him Individual

3      Number 1, because Ahmed wanted to obtain confidential

4      information with which to embarrass Individual 1 politically.

5      He wanted to embarrass or even expose as corrupt Individual

6      Number 1.  And I'm not making a finding that he was corrupt but

7      that seemed to be what Ahmed was up to.  And why would Ahmed do

8      this?  Because Individual 1 and his mother, the Prime Minister,

9      belonged to the ruling power in Bangladesh while -- ruling

10     party I should say, the party in power if you will, while Ahmed

11     and his allies belonged to the party currently out of power,

12     the party that had been in power in the past but at the present

13     time was not in power.

14             There are, just on this issue of what he was trying to

15     do, there were a number of references in the indictment itself

16     to e-mails between and among Lustyik, Ahmed and Thaler about

17     corruption allegations regarding Individual Number 1.  That

18     appears to be what he was getting at.  Let me see if I can find

19     something that suggests corruption and that will embarrass

20     Individual 1 and his mother and it may embarrass his party and

21     it may help my party which is currently on the outs.  The

22     desire to do that was what Ahmed wanted to do.

23             But it's not the gist of the bribery scheme.  It's not

24     the gist of the offenses to which Mr. Thaler has pleaded

25     guilty.  The gist of those offenses is the corruption of an FBI

F34ithas ag                    SENTENCE

agent and depriving the United States citizens of the honest

services of an FBI agent, or the right to the honest services

of an FBI agent.

        So those are the offenses of conviction here and

Thaler was not convicted of threatening to assault or kidnap or

even embarrass Individual 1 or threatening to harm him in some

other way.  That's not what Thaler was convicted of.  Thaler

was convicted of bribery and honest services fraud, which are

serious offenses to say the least, but he wasn't convicted of a

crime the object of which was to harm Individual 1.  So in my

view and I so find, Individual 1 is not a victim of the

offenses of conviction and therefore 3A1.2 does not apply.

        Now, having said that, Ahmed's goal, which was

effectively adopted by Thaler, because he knew exactly what

Ahmed goal was, Ahmed goal to embarrass Individual 1 by

releasing confidential information about his involvement in

arguably fraudulent or criminal activities, information that

was contained from the confidential files of the FBI, is

certainly relevant to sentencing.  To say the least, it's a

serious matter to corrupt an FBI agent in order to obtain dirt

on a political opponent.  But it is the corruption of the agent

not the use of the dirt that is the gist of these offenses.

        I often make the mistake of trying to oversimplify

things, but to me this is a square peg in a round hole problem.

What happened here was serious in all respects.  What happened

F34ithas ag                    SENTENCE

1    here *vis a vis* Individual Number 1 was serious, no question

2    about it.  But was Individual 1 a victim of these offenses of

3    conviction?  In my view, no, he was not.  It doesn't mean he

4    was treated fairly or nicely or graciously or appropriately or

5    kindly or any of these things.  But is he a victim of these

6    offenses of conviction?  No.

7            Also, I'll just add that the information obtained was

8    not owned by or created by Individual 1 and therefore it was

9    not taken or obtained from Individual 1.  If that were the case

10   obviously you may have a better argument that he was a victim.

11   But that's not what happened here.  So he's not a victim in

12   that sense.  And also I am not at all persuaded that this

13   official victim enhancement was intended to apply to a foreign

14   official or official's family.  The government has cited no

15   controlling or even persuasive authority to support their

16   argument on this point.  There's nothing -- well, the two cases

17   cited, one is the Kim case, a Southern District case, where the

18   district court said without citation to any evidence or

19   authority or legislative history or history of deliberations of

20   a Sentencing Commission whatsoever, just said that the

21   Sentencing Commission would have included U.N. employees in

22   this official victim guideline had that fact scenario been

23   presented to them.  I don't see why that is.  What's the basis

24   for that?  There's nothing in that opinion that supports that

25   rather -- well, that supports that statement.

F34ithas ag                    SENTENCE

1              Then there's also a case, the Lavario case from the

2    Fifth Circuit, the government in its brief says -- sorry, I

3    just want to find that.  Here it is.  Finding in *dicta*.  First

4    of all, you don't find something in *dicta*.  So that in and of

5    itself is a contradiction.  By definition *dicta* is just *dicta*,

6    it's just words.  An important point is that this was *dicta*,

7    that I guess in that case it involved an assault on a Mexican

8    border agent, something to that effect, it was an assault upon

9    a person reasonably recognized as a law enforcement officer

10   from a foreign country.  And the court in that case made

11   reference to this but did not rule that 3A1.2 applied to such a

12   person.  So it's *dicta* because there is no finding.

13             There's also nothing in 3A1.2 to suggest that it

14   applies to foreign officials.  I haven't found any other cases

15   on this point.  And in my view, contrary to what the district

16   court in the Kim case said, I'm quite certain, although I don't

17   have any evidence to back this up, but it's just a matter of

18   common sense that the Sentencing Commission did not have

19   foreign officials in mind when it drafted this guideline.

20   There's a whole bunch of statutes that make it a crime to

21   assault or harm or do other things to or threaten federal

22   officials.  And clearly they had that in mind.  There's no

23   question about that.  And if they had in mind officials of

24   foreign countries I think they might have mentioned that and

25   they didn't mention it.  It's never been mentioned.  The

F34ithas ag                    SENTENCE

guidelines have been round for 30 years.  As I said, I don't

mean to suggest that I know for a fact that they didn't

consider it, but common sense tells me that they did not

contemplate including foreign officials in this guideline.

        I need to say something else about the suggestion in

the government's brief that Ahmed in fact sought to kidnap and

physically harm Individual 1.  First of all, as to Thaler, I

don't recall seeing any evidence indicating that Thaler was

aware of any such intention by Ahmed.  As I read the

government's brief, the basis for that allegation is Ahmed's

post-arrest statement which was after all about 18 months after

this scheme came to an end or petered out is almost a better

way to put it, it almost kind of petered out, and it came in a

conversation with an agent in which he was discussing, he

meaning Ahmed, was discussing things that he had said to a

totally separate person, a new investigator that he had hired

after the Lustyik Thaler scheme petered out.  This on page 7 of

Exhibit A to the government's brief which is what the

government is referring to.  It says:  Ahmed told Steve, that's

the private investigator -- now Steve has nothing to do with

this case.  He came into this, into Ahmed's life after the

scheme that's at issue here had ended.  In any event Ahmed told

Steve that he wanted his help in obtaining private security for

BNP, evidently that's the name of the political party on the

outs that Mr. Ahmed belonged to, BNP party officials in

F34ithas ag                    SENTENCE

1    Bangladesh.  Ahmed also told Steve he wanted his help regarding

2    a plan by Ahmed to scare and hurt, it's redacted in my copy but

3    I'm sure it's referring to Individual Number 1.  And Ahmed

4    initially told OIG, Official of Inspector General,

5    investigators that he was just kidding about such a plan.

6           However, when questioned further Ahmed acknowledged

7    that his intent was genuine and he asked Steve for help in this

8    plan to hurt and kidnap but not kill Individual Number 1.

9    Ahmed said Steve told him that was possible but the two did not

10   discuss it further.  As far as I know that's it, at least

11   that's all that's been presented to me.

12          MR. ALLEE:  Your Honor, let me add something apropos

13   of what you just said.  What you just said is correct in that

14   the admission was about something that happened after the fact

15   of the scheme.

16          THE COURT:  The scheme involving Thaler.  It might

17   have been a different scheme but not this scheme.

18          MR. ALLEE:  We're not arguing that Thaler would have

19   known of that effort or those discussions.  On page 6 of our

20   brief we quote some text messages which were quoting other

21   documents in the case which your Honor may recall.  These are

22   messages when Lustyik and Thaler perceive or learn from Ahmed

23   that Ahmed is considering going with another leak, and they

24   are, they're not happy about that.  And Lustyik writes at the

25   bottom of page 6, the fourth quoted text that begins "I want to

F34ithas ag                    SENTENCE

1    kill C," as you continue --

2              THE COURT:  C is Ahmed, not Individual 1.  Lustyik --

3    he says I want to kill Ahmed.  But of course he didn't really

4    want to kill Ahmed.  But keep going.

5              MR. ALLEE:  Let me spin that text out.  Lustyik is

6    angered by this and now is contemplating revenge against Ahmed

7    and then says I will put a wire on and get, and we bracket it

8    to make it clear, Ahmed and his associates, I will put a wire

9    on them to admit they want a Bangladeshi figure offed.  And we

10   feel it's Individual 1.  Maybe that's not conclusive but it's a

11   demonstration that there had been discussion about Ahmed's more

12   nefarious intentions between these three co-conspirators.

13             THE COURT:  If I put even the slightest faith in

14   anything that Lustyik said during the course of this whole

15   episode, maybe it might represent that.  But I don't.  I don't

16   believe a word he says about anything, not just him, everybody

17   else in the scheme as well.  And to me that's just an angry man

18   saying stuffed stupid things, and we know that he's a stupid

19   man as well, because he ruined his life by engaging in this

20   behavior.  So if Ahmed had said that it would be different.

21   But Lustyik saying that without linking it directly to Ahmed is

22   just too thin.  It's not close enough.  It just isn't for me to

23   rely on it.

24             Moreover, Ahmed himself made conflicting statements

25   about what he intended.  This is when he was talking about his

F34ithas ag                    SENTENCE

1    conversations with Steve 18 months later, he made conflicting

2    statements according to the memorandum of interview about what

3    he really intended with respect to Individual 1.  And Ahmed as

4    well is someone who -- these guys are all full of it.  They're

5    so full of baloney.  There's another word I could use but I

6    won't.  But I just don't put stock in that.

7         Plus, all of the text messages and other evidence that

8    I've been shown is really about furthering Ahmed's political

9    aims.  Maybe the scheme changed later on, but as far as the

10   scheme that Thaler was convicted of, it's all about politics

11   and embarrassment and exposing alleged corruption and it's in

12   that nature.  There's no talk in those exchanges with one

13   exception that Mr. Allee had alluded to where Lustyik, an angry

14   Lustyik, who has not seen the big payday he was hoping to see,

15   is making these "big man" statements.  Well, I'll show him,

16   basically, and of course he never actually does that.  That's

17   it.  That's all you've got.  There's no talk in the exchanges

18   between Ahmed and Thaler or Ahmed and Lustyik about doing

19   physical harm to Individual 1.  So as far as I'm concerned,

20   that supposed objective is not part of the offenses of

21   conviction.

22        And as I said earlier, the context in which Ahmed made

23   these statements is not the context of this case.  So again,

24   it's just at least one step removed from this case.  And it

25   does not appear to be part of this case.  At most it's a part

F34ithas ag                    SENTENCE

1    of some other case or some other conspiracy that Ahmed was

2    involved in maybe.  Maybe.  I use that word advisedly.  But it

3    wasn't part of this case because it was related to Steve.

4           Finally -- and fortunately -- it's clear that

5    Individual 1 was not in fact physically harmed.  And there's no

6    evidence that there was ever an attempt to physically harm him.

7    In the statements that he made to the probation officer he said

8    that the release of confidential information could have led to

9    harm but obviously it didn't.  Could have means could have.

10   And as I said, there's simply nothing in the victim impact

11   statement that suggests he ever was harmed even reputationally

12   or politically.  He doesn't even say that.  It doesn't say

13   well, I lost my job as the advisor to the Prime Minister, and

14   I'm guessing he didn't lose his job, because the Prime Minister

15   is his mother and that's probably a pretty good connection to

16   have if you want to have a job in that country.

17          So it's just too attenuated.  There's no evidence of

18   actual harm, physical or otherwise.  I don't think it's an

19   official victim.  And I don't think the official victim

20   enhancement applies.  That's my ruling.

21          Based on the parties' agreement as set forth in their

22   plea agreement as well as my review of the presentence report

23   and my own evaluation of the guidelines, I therefore find and

24   conclude that the final offense level is 23 at Criminal History

25   Category I which yields a sentencing range of 46 to 57 months

F34ithas ag                    SENTENCE

1   in prison.  There's been no motion for any departure,

2   guidelines-based departure from the applicable range.

3           Does the government wish to be heard on sentencing?

4           MR. ALLEE:  Yes, your Honor.  And we also, as I noted,

5   we are aware that Individual 1 has asked to be heard.  Would

6   you prefer to hear that now or at a later point?

7           THE COURT:  I would prefer you to go first.

8           MR. ALLEE:  We understand your Honor's rulings.  Our

9   position remains the guidelines should be 63 to 78 months.

10          THE COURT:  I understand.  Your objection to my ruling

11  is clear on the record.

12          MR. ALLEE:  Our position is that the sentence should

13  be within the range we've advocated.  The aims of sentencing,

14  many of the aims of sentencing are implicated directly here.

15  The sentence must reflect the very serious nature of the

16  offense.  We've talked about that this is not your ordinary

17  bribery scheme.  This is involving the bribery of an FBI

18  special agent of 24 years who was in counter intelligence.  The

19  defendant here, Mr. Thaler, was a -- while we have talked about

20  both a minor and a critical participant in that scheme, he

21  arranged for the bribery scheme to begin and then arranged for

22  the participants in it to come together both by way of texts

23  and e-mails and eventually in person.  While only a thousand

24  dollars changed hands, that owes as much to the incompetence of

25  the conspirators as their criminal ambitions.  This was an

F34ithas ag                    SENTENCE

ambitious scheme that had it been more competently executed

would have yielded hundreds or tens or potentially hundreds of

thousands of dollars to the participants, and did yield

information coming out of the FBI's secret databases right here

at the White Plains resident agency, who were acting

unknowingly at the behest of Lustyik, and Lustyik sending that

information through Thaler to Ahmed and then Ahmed onto others.

One thing, just because it's come up a couple of times

and came up in bail arguments, that I want to briefly address

is it may be tempting to dismiss portions of this scheme as

sort of cartoonish or fantastical or seemingly inevitably meant

to fail because there were certain things, there was that ID

that Ahmed had that had the wrong address, there's the fact

that only a thousand dollars changed hands, there's been

mention that some of the participants were shoe salesmen at a

Macy's.  Those facts are all true but that of course shouldn't

undermine any of the seriousness of this.

This is an incredibly rare and serious situation.

This was an FBI agent.  The participants, Thaler, here the

defendant to be sentenced, succeeded in the scheme, in getting

the agent to overcome, not overcome, to be swayed to break that

oath which is not cartoonish at all.  This is a horrible and

serious success of an ambitious crime.  This may have been a

conspiracy of fools but it doesn't make it less of a serious

crime.

F34ithas ag                    SENTENCE

1          Not only is it serious in and of itself, this is an

2    affront to the justice system itself.  We have of course lots

3    of cases with FBI agents, other federal agents.  The notion

4    that this defendant assisted in bribing one and fulfilling a

5    bribery scheme to corrupt that agent offends the entire justice

6    system, it undermines the whole system itself, it creates in

7    the public eye the notion that other cases having nothing to do

8    with Lustyik, lack the integrity that they should have, that

9    the statements of FBI agents could be false or could be the

10   result of corruption rather than those agents fulfilling their

11   oaths.

12          THE COURT:  That agents can be bought.  If you have

13   the right amount of money, somebody can be bought.  That's the

14   suggestion that's created here and that is affront to the

15   justice system which is why the people of the United States are

16   the victims of these crimes.

17          MR. ALLEE:  I certainly don't want to reargue it, but

18   we said that Individual 1 was *a* victim, not *the* victim.  We

19   believe there are lots of victims.  All of the people in the

20   United States who rely on the integrity of the FBI agents are

21   victims here.  The entire system depends not only on the

22   integrity of those agents and of people not to assist them in

23   being corrupt, but the perception that it can't happen, if it

24   does happen it will meet a very serious consequence, there will

25   be a very serious accountability for that, to maintain that

F34ithas ag                    SENTENCE

1    integrity, and then by consequence the justice system itself

2    that we're all a part of.

3            The history and characteristics of the defendant which

4    Mr. Ser does well to highlight in the sentencing submission for

5    the defense of course includes that he's not been, this is his

6    first conviction, this is his first sentencing.  We don't

7    dispute some of that.  But there are a couple of things to say.

8    This is not his only offense.  He's awaiting sentencing in

9    Utah.  It's not something he's been sentenced for here in any

10   way.  We're not asking for that, at least.  It is certainly not

11   the case that the defendant has made one aberrational or

12   isolated misjudgment.  This is part of a long-running series of

13   acts that reflected a criminal mindset, a thorough, complete,

14   criminal mindset and a willingness to do the things I just

15   described, to participant in conduct that is an affront to our

16   system itself, and to net a lot of money through bribery.

17           The suggestion that it was born out of financial

18   hardship may be true.  That of course is not an excuse.  There

19   are a lots of hardships that people who turn to crime endure

20   and these are not that, they're not that far out of the

21   ordinary.  Mr. Thaler, of course, was laid off and had some

22   other hardships in his life.  But they do almost nothing to

23   explain this conduct.  It's such a disproportion between his

24   personal circumstances and the crime engaged in here.

25           Lastly, your Honor, on the issue of consecutive,

F34ithas ag                    SENTENCE

 1    concurrent, we of course did initially ask your Honor to order

 2    that the sentence be consecutive to the anticipated sentence in

 3    Utah, and we then withdrew that request.  We maintain that the

 4    sentences here absolutely should be consecutive and if they are

 5    not it will essentially be a free pass on one or the other.

 6    These are separate crimes.  They resulted in separate results.

 7            THE COURT:  I'm not going to order it to run

 8    concurrent or consecutive.  There's nothing to run it

 9    consecutive or concurrent to.  I'm not doing that.  The judge

10    in the other case will decide what's an appropriate sentence in

11    that case, and obviously she'll know what my sentence is, and

12    then she'll decide what she's going to do.  I'm not weighing in

13    on that debate one way or the other.  I'm going to sentence

14    Mr. Thaler for what he did here, period.

15            MR. ALLEE:  Our position is that that sentence should

16    be a sentence within the guidelines range.  That sentence would

17    promote respect for the law, it would deter others from this

18    kind of just fantastical and extravagant and really disruptive

19    kind of scheming, and would reflect the offense itself, the

20    seriousness of it.  Thank you.

21            THE COURT:  You advised me that Individual Number 1

22    wanted to be heard, and as I said, I don't believe that he's a

23    victim in terms of the official victim enhancement of the

24    guidelines.  But I'm not prepared to conclude that he's not a

25    victim for purposes of whether he should be permitted to speak

F34ithas ag                    SENTENCE

1    at this proceeding.

2            Mr. Ser, before I do that, do you have any comment

3    about that?

4            MR. SER:  I wasn't given any notice, your Honor, but I

5    won't object.

6            THE COURT:  He's welcome to do that.  If he would

7    prefer not to give his name, all the parties will know who he

8    is obviously, if he would prefer not to give his name, that's

9    entirely up to him.

10            MR. ALLEE:  Thank you, your Honor.

11            MR. WAZED:  Thank you a very much, your Honor.  My

12   name is Sajeeb Wazed.  I am, as you know, the son of the Prime

13   Minister of Bangladesh.  However, just to inform you as well, I

14   am a U.S. resident.  I live here in Washington, D.C. in the

15   suburbs.  My wife is American.  My position with the government

16   of Bangladesh is honorary and part-time.  I do not take payment

17   from the taxpayers of Bangladesh.  However, in Bangladesh I am

18   regarded as my mother's successor.  I have gotten involved in

19   politics over the years helping her.  And I am credited with

20   running our party's election campaign in this last election.

21            THE COURT:  You're not going to do things in

22   Bangladesh like we do them here where we have Bush, Clinton,

23   Bush, Clinton.

24            MR. WAZED:  Unfortunately, that has already happened

25   in Bangladesh, sort of like a brand.  My grandfather led our

F34ithas ag                    SENTENCE

1    independence movement.  His name was Sheikh Mujibur Rahman.

2    And he founded the country and was given the title of Father of

3    the Nation.  So that legacy lives on.  I don't expect it to

4    last forever; I hope it doesn't.  Frankly, I have not gotten

5    involved in politics because I want to.  I've gotten involved

6    because of circumstances like this.

7          Several years ago in 2004 there was assassination

8    attempt on my mother.  23 people were killed, 400 injured.

9    Currently, senior government officials of the current

10   opposition are behind bars having been convicted of that

11   attack.  The same terrorist group that actually carried out the

12   attack had planned an assassination attempt on me a year later

13   in Bangladesh.  Luckily, my trip circumstances changed and they

14   were never able to actually carry out the attack.  A couple of

15   years ago I was contacted by the FBI here in the U.S. that they

16   had picked up threats against me here in the U.S. from

17   individuals who were allied with our opposition.

18         Now, I'd like to point out here that our opposition

19   party -- our party in Bangladesh is the secular political

20   party.  Our opposition is right wing and they have an official

21   coalition with the largest fundamentalist political party in

22   Bangladesh.  And over the years they have used assassinations

23   and killings as a political tool continuously.  Even in the

24   past two months, they have conducted arson attacks on innocent

25   civilians in the hope of overthrowing our government.  These

F34ithas ag                    SENTENCE

1   are terrorist attacks.  Over a hundred people have been killed.

2              So what I would like to request to you is this.  Not

3   that for me, but for my family, we have always lived under a

4   threat by our opposition.  My grandfather was assassinated by

5   military officers with my entire family including my uncles,

6   their wives.  My youngest uncle was ten years old.  The chief

7   of army at the time was the founder of our opposition party who

8   became the first military dictator.  This an is ongoing threat,

9   something we learned to live with, and this is one of the

10  reasons I live here in the U.S. because I now have a family.  I

11  have a wife and an eight year old daughter.  It's a lot safer

12  for them here than in Bangladesh.  But it's incidents like this

13  where the FBI as well as our own intelligence services are

14  pickings up threats against me continuously because I am an

15  easier target here now than I am in Bangladesh.  In Bangladesh

16  I'm under heavy security.  Here not so much.

17             So beyond just the bribery scheme here, the threats,

18  whether it's from Mr. Ahmed or other individuals that he has

19  supplied information on me to which make it easier to locate me

20  because of this incident, I've had to move houses, I've had to

21  hide my address.  So it is a real threat to me, to my life, and

22  I would like to request your Honor that you at least put a

23  deterrence out for anyone else who may be from our opposition

24  living in the U.S. who may make such attempts.

25             THE COURT:  Thank you, Mr. Wazed.  I hear you and I

F34ithas ag                    SENTENCE

1    appreciate everything you just said.  Thank you for speaking.

2              Mr. Ser, do you wish to be heard?

3              MR. SER:  Just briefly, your Honor.

4              THE COURT:  You can say whatever you want but as

5    usual, you did a great job with your sentencing submission.

6    You always do that.  But let me tell you up front I'm most

7    interested in what he did, what your client did.  I'm less

8    interested in what a great guy he is and what a wonderful

9    family he has.  I'm assuming that these are his family members

10   here.  It's great that they are here.  It's especially grate

11   for your client that he's here because he needs their support.

12             But what Congress said in 3553 is the court needs to

13   consider first the nature and circumstances of the offense.

14   They didn't put that first accidently.  They put it first

15   because it's by far the most important thing.  You've submitted

16   a lot of information about your client's life and his family

17   life and his family and his children and his parents and his

18   upbringing.  That's all relevant, I'm not saying it's not

19   relevant.  It's just a lot less relevant than what he actually

20   did.  So that's what I'd like you to focus on.

21             MR. SER:  I will cut to the chase then, your Honor.

22   At page 7 and 8 of my sentencing submission I go into great

23   detail about the nature and circumstances of the offense and I

24   explain Mr. Thaler's involvement.  We've talked about it a

25   great deal already today.  He started out as a conduit between

F34ithas ag                    SENTENCE

1   Mr. Ahmed and Mr. Lustyik, introduced them.  And then he became

2   a courier of sorts relaying messages between the two and

3   attempting to provide Ahmed with the documents Lustyik was

4   capable of obtaining by virtue of his position with the FBI,

5   hoping to get money from Ahmed that he would then share with

6   Lustyik.  That issue is what the conduct is; no more, no less

7   at this point.

8          And in the end what it comes down to, and your Honor

9   said it earlier, a thousand dollars got exchanged.  There were

10  a lot of talks, a lot of discussions.  And I think that's a

11  crucial fact in this case.  Because when we look at the

12  guidelines, it's a starting point.  We have to decide are those

13  guidelines too high, too low or just right pursuant to 3553(a)

14  and various factors.  If we look at the nature and

15  circumstances of the offense and we compare it to the

16  guidelines, it really begs the question, and I mean I think

17  supports not only my request but Probation's recommendation

18  here.

19          The offense conduct involved Mr. Lustyik who is an FBI

20  agent.  Arguably that was taken into account by the base

21  offense level because there's an extra four points added under

22  the guideline calculation because of the involvement of a high

23  level official, namely the FBI agent Mr. Lustyik.  If we look

24  at the conduct, I think the guidelines double count that to an

25  extent.

F34ithas ag                    SENTENCE

1        THE COURT:  They double count what?  I know there's a

2   four-level adjustment.  But what's the double counting?

3        MR. SER:  When Mr. Thaler pled guilty to the bribery

4   and the honest services fraud, it involved Mr. Lustyik.  He's

5   the public official who is involved.  Nevertheless, that may be

6   taken into account by the base offense level, there's an

7   additional four-level enhancement that the guidelines call for,

8   because the offense conduct involves a high level government

9   official.

10        THE COURT:  That's not double counting, that's just

11   what the guidelines call for.

12        MR. SER:  Right, but I think the conduct is already

13   taken into account by the base offense level by virtue of the

14   nature and circumstances of the offense.  The bribery involved

15   Mr. Lustyik.  The honest services fraud deprived the public of

16   Mr. Lustyik's services.

17        THE COURT:  But Mr. Ser, I hear you, but the bribery

18   guideline applies to lots of different things.

19        MR. SER:  I understand that.

20        THE COURT:  In a commercial context, it could be

21   bribery that would be punishable in federal court.  What the

22   Commission said -- on this one there's no question what the

23   Commission meant -- they said there's bribery and there's

24   bribery and it's all bad and if you're convicted it's bad, but

25   if you're convicted of bribing a high-ranking public official,

F34ithas ag                    SENTENCE

1    it's really, really, really bad.  So he should be punished

2    accordingly.  And that's what he's convicted of.

3              MR. SER:  With regard to the intended loss, and I

4    think here that really is the rub, the question is because a

5    thousand dollars got exchanged that the intended loss was

6    higher, and we've agreed to that in the guidelines.  Should the

7    intended loss drive the sentencing here, if as everyone seems

8    to suggest this was a conspiracy of fools so to speak.  There

9    was a lot of talk and your Honor was correct.  Though there

10   seemed to be an agreement in place, eventually what happens is

11   Mr. Ahmed backs out and nothing else ever occurs after that one

12   exchange of documents as far as any additional exchanges go.

13   Nevertheless, the intended loss here is what really is driving

14   the intended guidelines, contemplating a loss far in excess of

15   a thousand dollars based on what your Honor observes is maybe a

16   shaky contract or agreement at best.

17             So we know about the bracket inflation as far as the

18   loss guidelines go.  There are cases, I've cited one, talk

19   about how intended loss is a poor measure perhaps of

20   culpability in a case like this.  So if you're going to get

21   down to the nature and circumstances, this comes down to a

22   thousand dollars, 500 of which Mr. Thaler got to keep.

23             As far as the nature of the documents go, yes,

24   confidential, sensitive.  But I think to put it into context we

25   need to compare it to what could have been disclosed.  And the

F34ithas ag                    SENTENCE

1    headlines lines today and yesterday, perhaps good timing, poor

2    timing, I don't know, but General Petraeus entered a guilty

3    plea to a misdemeanor where he'll receive a recommendation from

4    the government of two years probation.

5          If we want to talk about deterrence, yes, an

6    individual sentence here is important to deter because this is

7    horrible conduct.  But this isn't a highly publicized case like

8    General Petraeus, where the government comes out and says it's

9    okay to disclose eight black books of highly confidential

10   information which by the way included the names of operatives

11   for the CIA, I understand, far different than what we're

12   dealing with here, still serious nonetheless but different.

13         And so when I sat at home last night trying to figure

14   out how do I reconcile two years probation for -- and unlike

15   Mr. Thaler, someone who was a general long-term in the Army and

16   now or then headed the CIA, certainly well aware of his

17   obligations, how can I square what the government's

18   recommending with what the government decided to do in that

19   case and how does it affect the deterrence argument here.

20         I'm not putting out a question that a sentence in this

21   case shouldn't factor in deterrence.  But it's hard to

22   understand how a lengthy sentence as opposed to the 15-month

23   sentence, given the person, I won't go into his background and

24   characteristics, your Honor is well aware of those, having seen

25   that news story, and even this morning again on the television,

F34ithas ag                    SENTENCE

1    I tried to figure out, will a sentence that the government

2    wants really deter anything when the public sees what someone

3    like General Petraeus does and gets away with.  I don't know.

4    But I don't think a lengthy sentence as the government is

5    urging here is commensurate to the nature and circumstances of

6    the disclosures that were made.  Sensitive, confidential, yes,

7    and obviously difficult for Mr. Joy, but certainly it doesn't

8    rise to the level that we're seeing in either cases.

9              THE COURT:  Let me stop you right there.  Believe me,

10   I'm not here to comment on that other case.  I see the

11   connection you're trying to draw.  But there's a big difference

12   in that, as far as I know anyway from what I read in the

13   newspaper, what do I know, that's all I have, there was no

14   venality in that case.  In this case venality is exactly the

15   right word.  A desire to enrich yourself by engaging in

16   corruption.  That's the big difference.  Although I agree, that

17   case also involved serious disclosures of information.  If

18   you're going to draw a conclusion that's favorable to your

19   client from another case, you need to acknowledge that that

20   case is different from this case because of the lack of

21   venality.  This case is nothing but venal.  He didn't make much

22   off of it, but not for lack of trying.

23             MR. SER:  The relationship he had with his

24   girlfriend -- I won't get into the details.

25             THE COURT:  That's not venal.  Venal is money.  That's

F34ithas ag                    SENTENCE

1     what we're talking about.

2                MR. SER:  The question is did she benefit from it.

3     But the point is this, if we're looking to deter individuals,

4     and the government's argument here is you need to deter other

5     people from ever thinking they could bribe people to obtain

6     documents, the stories like General Petraeus certainly

7     undermine the effect of deterrence in a case like this.  I

8     don't think a lengthy sentence is necessary to deter.

9     Certainly it's not necessary to deter Mr. Thaler.  But I do

10    think the 15 months recommendation by Probation and our request

11    for 15 months is commensurate with the nature and circumstances

12    of the offense, given the nature of the disclosures that were

13    made.

14                As far as the venality goes, we have to consider that

15    any sentence here is going to be the first time for Mr. Thaler

16    in prison.  First time.  It's not going to be easy.  We're not

17    asking for probation, we're not asking for time served.  And he

18    still has to face the music in Utah on a different matter.  But

19    it is worth noting that these overlap, and according to

20    Probation they were overlapping in time and conduct.  And we

21    know from the suppression hearings we had, that they were very

22    interrelated because it was the subpoenas in that case that

23    kind of spawned this case.  And gave rise to the exact same

24    charge.  Different facts but similar charges.

25                So if you look at the money that was actually obtained

F34ithas ag                    SENTENCE

1    and the benefit had in conjunction with the nature of the

2    disclosures, does it merit the lengthy sentence the government

3    is urging?  Our position is it does not.  We think Probation

4    gets it right in that regard.

5              The question also is, because Mr. Lustyik is the one

6    at the FBI who has the connection and ability to get these

7    records, does Mr. Thaler's disclosure have to be viewed in

8    conjunction or relative to that.  Certainly the sentences will

9    be different to take that into account.  But in the disclosure

10   of the records we have here, Mr. Thaler wasn't immediately and

11   directly involved with, as Mr. Lustyik has done, ordering

12   subordinate agents at the field office in White Plains to

13   provide someone unknowingly with these records or to utilize

14   the databases to obtain them.

15             So if we look at and contextualize Mr. Thaler's

16   conduct, it's very different, and he should be treated

17   differently, and I know will be treated differently, from

18   Mr. Lustyik.  But I still speaks to the severity of the offense

19   conduct committed by Mr. Thaler.  Yes, it was a conspiracy; yes

20   Mr. Lustyik did that; and yes, they were given to Mr. Thaler.

21   But he wasn't the one necessarily or at all violating an oath.

22   He certainly did no good by encouraging and assisting

23   Mr. Lustyik in doing so, but I think he's differently situated

24   in that regard.  In the end this all petered out and nothing

25   additional occurred.  We have a span of six months, a single

F34ithas ag                    SENTENCE

disclosure and a thousand dollars.  If you take a look at that

conduct, I do think the 15-month term here would be

appropriate.

        I want to point out just two other small details.  As

far as his family circumstances, the family is now having

discussions with doctors about the length of time his father

might have left.  So his father's condition has certainly

worsened to the point where the doctors have concerns about

longevity.  And the effect that this case has had on his family

is such a big punishment to him.  Every time we talk it brings

Mr. Thaler to tears.  I know he understands he's going to

prison.  He acknowledges that.  But he's facing a much greater

punishment as far as the impact this has had on his family and

will have going forward.

        I would submit under the remainder of my paperwork in

the case that identifies the meeting conduct at Ahmed's house,

I don't need to rehash that, it's all spelled out in greater

detail than I think I've been able to do in other cases before

your Honor.  Thank you, your Honor.

        THE COURT:  All the lawyers in this case have done an

excellent job in case I forget to say this.

        Mr. Thaler, this is your opportunity to say anything

that you'd like or present any information that you'd like to

present before I impose sentence.  You're not required to do

so.  I'm going to give you that opportunity at this time.

F34ithas ag                    SENTENCE

1              THE DEFENDANT:  I'd like to say that I'm deeply sorry

2    for this whole situation that's happened here and how it's

3    affected my family and everyone I know in my life as it is.  I

4    can only guarantee that nothing like this will ever happen

5    again in my lifetime.  That's it.

6              THE COURT:  Have a seat.

7              Let me say first that in deciding the appropriate

8    sentence in this case, I've considered all of the statutory

9    factors set forth in Section 3553(a) of Title 18 of the United

10   States Code.  Here's what happened in this case so far as I can

11   tell.  Mr. Thaler, who had one friend, Lustyik, who was a

12   senior counter intelligence agent for the FBI, made another

13   friend, Ahmed, while they both worked at the Danbury Fair Mall.

14   Somehow Thaler hears that his mall friend, Ahmed, wants to

15   obtain confidential information from the FBI or from somewhere

16   to use for political purposes to embarrass the son of the Prime

17   Minister of Bangladesh, both of whom, meaning the son and the

18   Prime Minister, are prominent members of the current ruling

19   party in Bangladesh.  And he also learns, this is really

20   important, that Ahmed, or someone working with Ahmed, is

21   willing to pay really good money for such information.

22             So at that point, Mr. Thaler makes a rather fateful

23   decision.  And the decision he made which was made deliberately

24   and evidently because he was undergoing financial difficulties

25   at the time was to bring this swell idea to the attention, and

F34ithas ag                    SENTENCE

1    I say that obviously sarcastically, to bring this idea to the

2    attention of his FBI friend hoping that the both of them could

3    make a lot of money in the process.

4            And Lustyik, for reasons that I simply cannot

5    understand but nonetheless this is what he did, he agrees to

6    this idea.  He could have put the whole thing to an end right

7    then and there and said listen, pal, are you crazy.  I'm not

8    going to do that.  Go tell the guy to pound sand.  Could have

9    done that.  He didn't.  Instead he agreed to do what Ahmed

10   asked, namely to disclose information from the confidential

11   files of the FBI in exchange for cash.

12           As I said, Mr. Thaler says he was motivated by his own

13   financial distress, but honestly, Mr. Thaler, that is a

14   pathetic excuse.  I'm not sure you were offering it as an

15   excuse, you're offering it to try to put in context what you

16   did.  But you know what, it's pathetic.  What you did was with

17   full knowledge of exactly what was happening.  You

18   deliberately, voluntarily, willfully, intentionally entered

19   into a bribery scheme involving an FBI agent working in counter

20   intelligence.  This is not paying a kickback to a purchasing

21   agent at Staples or something.  This is not bribing the highway

22   superintendent in the town of New Fairfield.  An FBI agent

23   working in counter intelligence.  And you thought it was a good

24   idea to do this because you needed the money.  Pathetic.  And I

25   think you know that.  I think you know that.  I'm not trying to

F34ithas ag                    SENTENCE

1    be mean to you.  I'm just trying to tell you the truth.

2              What you wanted to do was get rich quick.  By

3    monetizing your relationship with this fellow Lustyik,

4    apparently a friend of yours since Sleepy Hollow High School.

5    And what you wanted was a retainer of $40,000, pretty good

6    money, presumably in cash, it's unlikely they would give you a

7    check and issue you a 1099, and then monthly payments of

8    $30,000 which you would split 50-50, not 60-40 or ten for you

9    and 90 for him, but 50-50 with Lustyik.

10             And you had to know that what you were doing was not

11   just wrong but shockingly wrong, shocking.  Mr. Allee is

12   absolutely right.  This is shockingly bad conduct.  It's an

13   affront to the justice system.  And you had to know that.  You

14   did know that.  There's no question you knew that.  It's not as

15   if you said to yourself well, it's just Bangladesh, nobody

16   cares about Bangladesh, so what.  You knew that what you were

17   doing was terribly and shockingly wrong and you did it anyway,

18   for money.

19             In the end, you didn't get much money.  You got money

20   for a couple of dinners.  It's tragic, really, at so many

21   levels.  You end up getting $500 out of this scheme, in other

22   words, half of the thousand dollars that was paid by Ahmed.

23   But as I said earlier, that was not for lack of trying.  It was

24   an effort, very serious effort made with your pal Lustyik.  I'm

25   not sure I understand this really.  I know that it was

F34ithas ag                    SENTENCE

1   terrible, I know that it was wrong.  I don't know, maybe

2   Mr. Lustyik made you feel important, made you feel like a big

3   shot.  Because he was definitely a big shot, there's no

4   question about that.  And maybe your association with him made

5   you feel like a big shot.  I don't know.  I really don't know.

6   I'd like to know, but I don't really know.

7        It doesn't really matter.  To me what you did was just

8   terrible.  And the fact that you only got a thousand dollars

9   out of it is relevant but it's less relevant than what you were

10  trying to do and what you did do which was to corrupt,

11  participate in the corruption of an FBI agent.

12        The reason the scheme didn't go anywhere is because of

13  this "show me the money" problem.  You wanted Mr. Ahmed to show

14  you the money before you showed him the stuff you were going to

15  give him and he wanted you to show him the stuff before he

16  showed you the money and eventually that was the end of it and

17  you walked away from each other.  It's relevant that you were

18  engaged in some kind of similar sort of behavior in connection

19  with this Utah case.  But as I say, I'm not considering any

20  aspect of the Utah case in deciding -- let me just take back

21  what I just said.  It's interesting that this arises in the

22  context of some kind of similar conduct in Utah, but I am not

23  considering anything that you did in Utah in connection with

24  the matter that you have been charged with there, convicted of

25  there, I'm not considering any aspect of that in the sentence

F34ithas ag                     SENTENCE

1    here.  I don't have to.  This is bad, what you did here.

2            And the only reason the scheme didn't go anywhere is

3    because you didn't want to show him information without seeing

4    the money and he didn't want to show you the money without

5    seeing the information.  But as I said, it wasn't for lack of

6    trying.

7            The venality of this conduct is really offensive.  I'm

8    going to honor the contract between Mr. Thaler and the

9    government to treat Mr. Thaler as a minor participant.  And

10   that has an effect on the guideline range of course.  But the

11   fact is this scheme could not have happened without Mr. Thaler.

12   So you may qualify, he does qualify for the minor role

13   adjustment.  But that doesn't change the fact that it couldn't

14   have happened without him.

15           I'm told that Mr. Thaler has extensive experience as a

16   commission-based salesman.  That's rather ironic.  Am I the

17   only person to see the irony of that?  It's ironic because what

18   happened here is that Thaler sought to earn a commission by

19   brokering the sale of an FBI agent's integrity, in fact, his

20   soul.  So you're a salesman, you got a buyer, you got a seller,

21   you're trying to put them together and to earn a fee for doing

22   it.  It's ironic that that's what you chose to use your skills

23   as a commission-based salesman to do.

24           The question remains, having said all of that, what's

25   the appropriate sentence in this case which has to be

F34ithas ag                    SENTENCE

1   sufficient but not greater than necessary to satisfy the

2   sentencing objectives of 3553(a).  Here it's highly relevant on

3   that point that Mr. Thaler is far less culpable than

4   Mr. Lustyik because it was Lustyik not Thaler who used his

5   position to obtain the information to sell to Ahmed.  It's also

6   true that the ten-level upward adjustment based on the value of

7   the contemplated but never paid payment results in a somewhat

8   skewed sentencing range of 46 to 57 months.  As I said, the

9   parties agreed to this enhancement, I'm honoring that

10  agreement.  But that doesn't mean that I can't also believe

11  that that agreed-upon figure overstates the true magnitude of

12  the scheme.

13          Again, don't misread what I'm saying here.  It doesn't

14  mean that the scheme did not have a great magnitude.  It did.

15  What are we doing here?  Of course it was a terrible thing.

16  It's just that I feel that the enhancement based on the amount

17  of money involved to some extent overstates the magnitude of

18  the scheme.  Lustyik and Thaler talked about and even demanded

19  tens of thousands of dollars from Ahmed.  But the amount of the

20  benefit actually obtained was only a thousand dollars.  If you

21  were to calculate the guidelines based on that amount, I'm not

22  doing that, but I'm just using that I suppose for dramatic

23  effect, if you were to calculate the guidelines based on that

24  amount, the final offense level would be 13 and the sentencing

25  range would be 12 to 18 months.  With everything else being in

F34ithas ag                SENTENCE

1    play, the four-level enhancement for high level public

2    official, the two levels off for minor role, all the other

3    guidelines adjustments would still apply, and where you'd end

4    up in this terribly serious matter involving corruption of an

5    FBI agent is 12 to 18 months.  That's what the guidelines would

6    provide.

7              And the fact that the actual amount paid was so far

8    less than the amount that drives the calculation of the range

9    is a mitigating factor it seems to me.  There's just a dramatic

10   disconnect between the actual amount and the contemplated

11   amount.  And there should be some, and I will consider that as

12   a mitigating factor.  There's consideration in a fair and just

13   system of the fact that the actual deal that ultimately was

14   done here was a thousand dollars.  So I believe that that's a

15   mitigating factor that warrants a downward variance from the

16   guideline range.  Not to 12 to 18 months, but a downward

17   variance.

18             It's also relevant that this was a nonviolent offense

19   committed by a first time offender, that there's no evidence

20   that anyone was actually harmed physically or otherwise, and

21   that there's no evidence that national security was compromised

22   in any way.  Those things are relevant although Mr. Thaler's

23   conduct created a huge risk of both harm to an individual or

24   individuals and to the national security.  But I think it's a

25   mitigating factor that those harms did not come to pass.

F34ithas ag                    SENTENCE

1            So again, the question is what's sufficient but not

2    greater than necessary, considering all of these, the multitude

3    of relevant factors here.  And I've concluded that a sentence

4    of 30 months imprisonment followed by two years supervised

5    release is sufficient but not greater than necessary,

6    considering the nature and circumstances of the offense, the

7    history and characteristics of the defendant and the need for

8    the sentence imposed to reflect the seriousness of the offense,

9    and I can't underscore enough how serious this was, the need

10   for the sentence to promote respect for the law, to provide

11   just punishment and afford adequate deterrence.  The key word

12   of course is adequate deterrence.  That's what Congress said.

13   They didn't say maximum deterrence.  Because if they did then

14   we would just impose capital punishment on everybody that was

15   convicted of a crime.  That would probably deter people.

16   That's not a fair and just system in our fair and just society.

17   We're imperfect but we try to be fair and just.  It would not

18   be just in my view to impose a sentence greater than 30 months

19   for the purpose of insuring adequate deterrence.

20            I've said this before, deterrence, you can graph the

21   significance of deterrence on an X and Y graph and it just

22   seems to me, of course every case is different, but you need to

23   impose a jail sentence in a case like this to achieve

24   deterrence.  So the curve is fairly step at the beginning but

25   at some point the extra deterrent value of a lengthier sentence

F34ithas ag                    SENTENCE

1  levels off, so the graph kind of levels off or the curve levels

2  off.  And I think this is an example of that.  I think 30

3  months is sufficient to afford adequate deterrence.  But I

4  don't think that anything less than 30 months would be adequate

5  to reflect the blatantly corrupt nature of this crime.  And

6  that's why I cannot accept the probation officer's

7  recommendation for a 15-month sentence.  It's simply too

8  lenient to satisfy the objectives of 3553(a).

9           I will add the following.  Even if I had imposed or

10  even I had found that the three-level official victim

11  enhancement applied I would still impose the same sentence

12  because I am taking that into consideration.  I'm taking into

13  consideration the potential effect and the gross behavior, the

14  potential effect on Mr. Wazed and his family, and the gross and

15  just mean-spirited behavior of Mr. Ahmed and Mr. Thaler and

16  Mr. Lustyik as if they don't care.  Because obviously they

17  didn't care.  Couldn't care less about Mr. Wazed.  It's really

18  shocking.  And I am shocked by it.

19           And I appreciate that Mr. Wazed is here and I take

20  everything he says absolutely seriously.  But in the end, I

21  would have imposed the same sentence even if the three-level

22  official victim enhancement applied because I think under all

23  the circumstances, including everything I've heard about

24  Mr. Wazed, that that's the appropriate sentence in this case.

25           Taking into account all the facts and circumstances,

F34ithas ag                    SENTENCE

1   including all the facts and circumstances relating to

2   Mr. Wazed, 30 months imprisonment is sufficient but not greater

3   than necessary to comply with the purposes of sentencing.  And

4   as I said earlier, I want to make clear that I am not ordering

5   that this sentence run concurrently with or consecutively to

6   any other sentence anywhere else at any time.  That's not what

7   this is about.  I'm imposing this sentence for this crime.  It

8   does not take into consideration any conduct defendant engaged

9   in in Utah, or in connection with the Utah case.

10          Does either counsel know of any legal reason why the

11   sentence should not be imposed as stated?

12          MR. ALLEE:  No, your Honor.

13          THE COURT:  Mr. Ser?

14          MR. SER:  No, your Honor.

15          THE COURT:  Mr. Thaler, please stand.

16          It is the judgment of the this Court that you be

17   committed to the custody of the United States Bureau of Prisons

18   for a total term of 30 months to be followed by two years of

19   supervised release.  The standard conditions of supervised

20   release 1-13 shall apply.  The following mandatory conditions

21   which are on page 28 of the PSR shall also apply as follows.

22   The defendant shall not commit another federal, state or local

23   crime.  The defendant shall not illegally possess a controlled

24   substance.  The defendant shall not possess a firearm or

25   destructive device.  The defendant shall refrain from any

F34ithas ag                    SENTENCE

1     unlawful use of a controlled substance.  The defendant shall

2     refrain from any unlawful use of a controlled substance.  The

3     defendant shall submit to one drug-testing within 15 days of

4     placement on probation or supervised release and at least two

5     unscheduled drug tests thereafter as directed by the probation

6     officer.  And finally, the defendant shall cooperate in the

7     collection of DNA as directed by the probation officer.

8            In addition the following special conditions shall

9     apply.  They're on page 29.  The defendant is to report to the

10    nearest Probation Office within 72 hours of his release from

11    custody.  And the defendant shall be supervised by list

12    district of residence.  If that's Connecticut then of course

13    you'll be supervised by the District of Connecticut.

14           I'm not imposing a fine because the defendant does not

15    have the ability to pay a fine.  Restitution is not applicable

16    here.  I am imposing the mandatory special assessment of one

17    hundred dollars per count, so the total is two hundred dollars

18    which is due immediately.

19           The foregoing constitutes the sentence of the Court.

20           Mr. Thaler, you may have a seat.  You have the right

21    to appeal your sentence subject to any limitations on that

22    right contained in your plea agreement with the government.  If

23    you're unable to pay the costs of an appeal you may apply for

24    leave to appeal without payment of costs.  A notice of appeal

25    must be filed within 14 days after the entry of judgment.

F34ithas ag                    SENTENCE

1  Therefore, if you do wish to appeal you must advise your

2  attorney to prepare and file a notice of appeal immediately,

3  or, if you request, the clerk will immediately prepare and file

4  a notice of appeal on your behalf.

5          I believe there are open counts, Mr. Allee.

6          MR. ALLEE:  Yes, your Honor.  We ask that the Court

7  dismiss the open counts.

8          THE COURT:  I made a note that it's Counts 1, 5 and 6.

9  Does that sound right to you?  We'll check that.  But the point

10  is all the open counts in the indictment will be dismissed.

11          MR. SER:  No objection, your Honor.

12          THE COURT:  Are there any recommendations to the

13  Bureau of Prisons, Mr. Ser, that you would like me to include

14  in the judgment?

15          MR. SER:  Yes.  Nearest to family in Connecticut if

16  possible.

17          THE COURT:  He lives in New Fairfield.

18          MR. SER:  Correct, your Honor.

19          THE COURT:  The way I like to phrase it is as near as

20  possible to New Fairfield, Connecticut.  I know there's a

21  federal prison right there but I don't think it takes male

22  prisoners.  But in any event I'll say as near as possible to

23  New Fairfield, Connecticut.  Anything else in the judgment that

24  you want me to recommend?

25          MR. SER:  I don't think so, your Honor, other than a

F34ithas ag                          SENTENCE

1      self-surrender date.

2              THE COURT:  On that point, Mr. Allee, what's the

3      government's position?

4              MR. ALLEE:  We're not opposed to a self-surrender.  We

5      ask that the time frame for that not be lengthy, your Honor.

6              THE COURT:  Then I will permit the defendant to

7      self-surrender to an institution to be designated by the Bureau

8      of Prisons.

9              MR. ALLEE:  I'm sorry to interrupt you.  I'm reminded

10     that Mr. Thaler faces sentencing in another district and we

11     think that it's March 30.

12             THE COURT:  Right.  So that applies.  I'm not

13     counteracting any order from any judge in Utah.  Sometimes

14     there are delays or things may happen.  I'm sentencing him for

15     what happened here and I'm going to order a surrender date for

16     what happened here.  But if he goes to Utah and in Utah the

17     judge decides that he doesn't get a surrender date, then that's

18     what happens.  If she does give a surrender date then his

19     surrender date is still April 20th on my case.

20             MR. ALLEE:  Yes.  We just don't want to create a

21     logistical difficulty if the date was near --

22             THE COURT:  It's going to be after.  You said it was

23     March 30th in Utah?

24             MR. ALLEE:  Yes, your Honor.

25             THE COURT:  We're supposed to do it roughly 45 days.

F34ithas ag                    SENTENCE

1    April 20th is the date that I came up with, at two p.m.  He's

2    to surrender at the institution to be designated by the Bureau

3    of Prisons on April 250, 2015 at two p.m.  Bail will be

4    continued.

5          Mr. Thaler, what that means is that you're still

6    subject to all of the conditions upon which you were previously

7    released.  If you violate any of those conditions you could be

8    arrested and remanded.  I would urge you not to do that.  I

9    don't think you will.  Anyway, as far as my case is concerned,

10   your surrender date is April 20, 2015.

11         And I will just add, it's a terrible tragedy, it

12   really is.  It's so bad for so many people, not just for you,

13   Mr. Thaler, but for the public, for Mr. Wazed and his family.

14   And I just don't get it.  I don't know what could possibly make

15   you think that for a few thousand dollars, even for many

16   thousands of dollars, it was okay to do this or worth the risk

17   to do this.  I don't get it.  But I'm constantly surprised by

18   human behavior.  So I'm just going to add this to the list of

19   surprises that I've had over the years.  I do wish you the best

20   of luck.  I wish your family the best of luck.  I hope you

21   believe me when I tell you that.  But this is the appropriate

22   sentence.  We're adjourned.

23         THE COURTROOM DEPUTY:  All rise.

24         This Court will be in recess.

25         (Record closed)